# NATIONAL LABOR RELATIONS BOARD *v.* CITY DISPOSAL SYSTEMS, INC.

No. 82–960.   Argued November 7, 1983—Decided March 21, 1984

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 841.

*Norton J. Come* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Wallace, Carter G. Phillips, Linda Sher,* and *Elinor Hadley Stillman.*

*Robert P. Ufer* argued the cause for respondent. With him on the brief were *Thomas G. Kienbaum* and *Theodore R. Opperwall.*\*

JUSTICE BRENNAN delivered the opinion of the Court.

James Brown, a truckdriver employed by respondent, was discharged when he refused to drive a truck that he honestly and reasonably believed to be unsafe because of faulty brakes. Article XXI of the collective-bargaining agreement between respondent and Local 247 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, which covered Brown, provides:

> "The Employer shall not require employees to take out on the streets or highways any vehicle that is not in safe operating condition or equipped with the safety appli-

---

\*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *J. Albert Woll, Laurence Gold,* and *George Kaufmann;* and for Teamsters for a Democratic Union by *Paul Alan Levy* and *Alan B. Morrison.*

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *Edward B. Miller* and *Stephen A. Bokat;* for the Legal Foundation of America by *David Crump;* and for Roadway Express, Inc., by *Michael C. Towers* and *Mark E. Edwards.*

ances prescribed by law. It shall not be a violation of this Agreement where employees refuse to operate such equipment unless such refusal is unjustified."[1]

The question to be decided is whether Brown's honest and reasonable assertion of his right to be free of the obligation to drive unsafe trucks constituted "concerted activit[y]" within the meaning of §7 of the National Labor Relations Act (NLRA or Act), 61 Stat. 140, 29 U. S. C. §157.[2] The National Labor Relations Board (NLRB or Board) held that Brown's refusal was concerted activity within §7, and that his discharge was, therefore, an unfair labor practice under §8(a)(1) of the Act, 61 Stat. 140, 29 U. S. C. §158(a).[3] 256 N. L. R. B. 451 (1981). The Court of Appeals disagreed and declined enforcement. 683 F. 2d 1005 (CA6 1982). At least three other Courts of Appeals, however, have accepted the Board's interpretation of "concerted activities" as including the assertion by an individual employee of a right grounded in a collective-bargaining agreement.[4] We granted certio-

---

[1] App. 64. Article XXI also provides that "[t]he Employer shall not ask or require any employee to take out equipment that has been reported by any other employee as being in an unsafe operating condition until same has been approved as being safe by the mechanical department."

[2] Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 61 Stat. 140.

[3] Section 8(a)(1) of the NLRA provides:

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 61 Stat. 140.

[4] See, e. g., NLRB v. Ben Pekin Corp., 452 F. 2d 205 (CA7 1971); NLRB v. Selwyn Shoe Manufacturing Corp., 428 F. 2d 217, 221 (CA8 1970); NLRB v. Interboro Contractors, Inc., 388 F. 2d 495 (CA2 1967). At least four Circuits share the position of the Sixth Circuit on this question. See, e. g., Royal Development Co., Ltd. v. NLRB, 703 F. 2d 363, 374 (CA9 1983); Roadway Express, Inc. v. NLRB, 700 F. 2d 687, 693–694

rari to resolve the conflict, 460 U. S. 1050 (1983), and now reverse.

## I

The facts are not in dispute in the current posture of this case.[5]  Respondent, City Disposal Systems, Inc. (City Disposal), hauls garbage for the city of Detroit.  Under the collective-bargaining agreement with Local Union No. 247, respondent's truckdrivers haul garbage from Detroit to a landfill about 37 miles away.  Each driver is assigned to operate a particular truck, which he or she operates each day of work, unless that truck is in disrepair.

James Brown was assigned to truck No. 245.  On Saturday, May 12, 1979, Brown observed that a fellow driver had difficulty with the brakes of another truck, truck No. 244. As a result of the brake problem, truck No. 244 nearly collided with Brown's truck.  After unloading their garbage at the landfill, Brown and the driver of truck No. 244 brought No. 244 to respondent's truck-repair facility, where they were told that the brakes would be repaired either over the weekend or in the morning of Monday, May 14.

Early in the morning of Monday, May 14, while transporting a load of garbage to the landfill, Brown experienced difficulty with one of the wheels of his own truck—No. 245—and brought that truck in for repair.  At the repair facility,

---

(CA11 1983); *NLRB* v. *Buddies Supermarkets, Inc.*, 481 F. 2d 714 (CA5 1973) (dictum); *NLRB* v. *Northern Metal Co.*, 440 F. 2d 881 (CA3 1971). See also *Kohls* v. *NLRB*, 203 U. S. App. D. C. 139, 142–143, 629 F. 2d 173, 176–177 (1980) (expressing doubt about the validity of the *Interboro* doctrine).  In *Roadway Express, Inc.* v. *NLRB*, 532 F. 2d 751 (1976), the Fourth Circuit enforced, without opinion, a decision of the Board applying the *Interboro* doctrine, *Roadway Express, Inc.*, 217 N. L. R. B. 278 (1975), but in *Krispy Kreme Doughnut Corp.* v. *NLRB*, 635 F. 2d 304, 308–310 (1980), the court indicated that it remained an open issue whether the *Interboro* doctrine would be followed in that Circuit.

[5] Respondent argued below that the Board erred in concluding that James Brown was motivated by an honest belief in the factual validity of his claim.  That issue, however, is not before us.

Brown was told that, because of a backlog at the facility, No. 245 could not be repaired that day. Brown reported the situation to his supervisor, Otto Jasmund, who ordered Brown to punch out and go home. Before Brown could leave, however, Jasmund changed his mind and asked Brown to drive truck No. 244 instead. Brown refused, explaining that "there's something wrong with that truck. . . . [S]omething was wrong with the brakes . . . there was a grease seal or something leaking causing it to be affecting the brakes." Brown did not, however, explicitly refer to Article XXI of the collective-bargaining agreement or to the agreement in general. In response to Brown's refusal to drive truck No. 244, Jasmund angrily told Brown to go home. At that point, an argument ensued and Robert Madary, another supervisor, intervened, repeating Jasmund's request that Brown drive truck No. 244. Again, Brown refused, explaining that No. 244 "has got problems and I don't want to drive it." Madary replied that half the trucks had problems and that if respondent tried to fix all of them it would be unable to do business. He went on to tell Brown that "[w]e've got all this garbage out here to haul and you tell me about you don't want to drive." Brown responded, "Bob, what you going to do, put the garbage ahead of the safety of the men?" Finally, Madary went to his office and Brown went home. Later that day, Brown received word that he had been discharged. He immediately returned to work in an attempt to gain reinstatement but was unsuccessful.

On May 15, the day after the discharge, Brown filed a written grievance, pursuant to the collective-bargaining agreement, asserting that truck No. 244 was defective, that it had been improper for him to have been ordered to drive the truck, and that his discharge was therefore also improper. The union, however, found no objective merit in the grievance and declined to process it.

On September 7, 1979, Brown filed an unfair labor practice charge with the NLRB, challenging his discharge. The Ad-

ministrative Law Judge (ALJ) found that Brown had been discharged for refusing to operate truck No. 244, that Brown's refusal was covered by § 7 of the NLRA, and that respondent had therefore committed an unfair labor practice under § 8(a)(1) of the Act. The ALJ held that an employee who acts alone in asserting a contractual right can nevertheless be engaged in concerted activity within the meaning of § 7:

> "'[W]hen an employee makes complaints concerning safety matters which are embodied in a contract, he is acting not only in his own interest, but is attempting to enforce such contract provisions in the interest of all the employees covered under that contract. Such activity we have found to be concerted and protected under the Act, and the discharge of an individual for engaging in such activity to be in violation of Section 8(a)(1) [of the Act].'" 256 N. L. R. B., at 454 (quoting *Roadway Express, Inc.*, 217 N. L. R. B. 278, 279 (1975)).

The NLRB adopted the findings and conclusions of the ALJ and ordered that Brown be reinstated with backpay.

On a petition for enforcement of the Board's order, the Court of Appeals disagreed with the ALJ and the Board. Finding that Brown's refusal to drive truck No. 244 was an action taken solely on his own behalf, the Court of Appeals concluded that the refusal was not a concerted activity within the meaning of § 7. This holding followed the court's prior decision in *ARO, Inc.* v. *NLRB*, 596 F. 2d 713 (CA6 1979), in which the Court of Appeals had held:

> "For an individual claim or complaint to amount to concerted action under the Act it must not have been made solely on behalf of an individual employee, but it must be made on behalf of other employees or at least be made with the object of inducing or preparing for group action and have some arguable basis in the collective bargaining agreement." *Id.*, at 718.

## II

Section 7 of the NLRA provides that "[e]mployees shall have the right to . . . join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U. S. C. § 157. The NLRB's decision in this case applied the Board's longstanding *"Interboro* doctrine," under which an individual's assertion of a right grounded in a collective-bargaining agreement is recognized as "concerted activit[y]" and therefore accorded the protection of § 7.[6] See *Interboro Contractors, Inc.*, 157 N. L. R. B. 1295, 1298 (1966), enf'd, 388 F. 2d 495 (CA2 1967); *Bunney Bros. Construction Co.*, 139 N. L. R. B. 1516, 1519 (1962). The Board has relied on two justifications for the doctrine: First, the assertion of a right contained in a collective-bargaining agreement is an extension of the concerted action that produced the agreement, *Bunney Bros. Construction, supra,* at 1519; and second, the assertion of such a right affects the rights of all employees covered by the collective-bargaining agreement. *Interboro Contractors, supra,* at 1298.

We have often reaffirmed that the task of defining the scope of § 7 "is for the Board to perform in the first instance as it considers the wide variety of cases that come before it," *Eastex, Inc.* v. *NLRB*, 437 U. S. 556, 568 (1978), and, on an issue that implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference, *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978);

---

[6] The NLRB has recently held that, where a group of employees are not unionized and there is no collective-bargaining agreement, an employee's assertion of a right that can only be presumed to be of interest to other employees is not concerted activity. *Meyers Industries, Inc.*, 268 N. L. R. B. 493 (1984). The Board, however, distinguished that case from the cases involving the *Interboro* doctrine, which is based on the existence of a collective-bargaining agreement. The *Meyers* case is thus of no relevance here.

*NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 130–131 (1944). The question for decision today is thus narrowed to whether the Board's application of § 7 to Brown's refusal to drive truck No. 244 is reasonable.[7] Several reasons persuade us that it is.

A

Neither the Court of Appeals nor respondent appears to question that an employee's invocation of a right derived from a collective-bargaining agreement meets § 7's requirement that an employee's action be taken "for purposes of collective bargaining or other mutual aid or protection." As the Board first explained in the *Interboro* case, a single employee's invocation of such rights affects all the employees that are covered by the collective-bargaining agreement. *Interboro Contractors, Inc., supra,* at 1298. This type of generalized effect, as our cases have demonstrated, is sufficient to bring the actions of an individual employee within the "mutual aid or protection" standard, regardless of whether the employee has his own interests most immediately in mind. See, *e. g., NLRB* v. *J. Weingarten, Inc.,* 420 U. S. 251, 260–261 (1975).

The term "concerted activit[y]" is not defined in the Act but it clearly enough embraces the activities of employees who have joined together in order to achieve common goals. See, *e. g., Meyers Industries, Inc.,* 268 N. L. R. B. 493, 494–495 (1984). What is not self-evident from the language of

---

[7] Respondent argues that because "the scope of the 'concerted activities' clause in Section 7 is essentially a jurisdictional or legal question concerning the coverage of the Act," we need not defer to the expertise of the Board. Brief for Respondent 13. We have never, however, held that such an exception exists to the normal standard of review of Board interpretations of the Act; indeed, we have not hesitated to defer to the Board's interpretation of the Act in the context of issues substantially similar to that presented here. *E. g., NLRB* v. *J. Weingarten, Inc.,* 420 U. S. 251, 266–267 (1975) (right under § 7 to have union representative present at investigatory interview of employee). See also *Bayside Enterprises, Inc.* v. *NLRB,* 429 U. S. 298, 302–303 (1977) (definition of agricultural workers).

the Act, however, and what we must elucidate, is the precise manner in which particular actions of an individual employee must be linked to the actions of fellow employees in order to permit it to be said that the individual is engaged in concerted activity. We now turn to consider the Board's analysis of that question as expressed in the *Interboro* doctrine.

Although one could interpret the phrase, "to engage in other concerted activities," to refer to a situation in which two or more employees are working together at the same time and the same place toward a common goal, the language of § 7 does not confine itself to such a narrow meaning. In fact, § 7 itself defines both joining and assisting labor organizations—activities in which a single employee can engage— as concerted activities.[8] Indeed, even the courts that have rejected the *Interboro* doctrine recognize the possibility that an individual employee may be engaged in concerted activity when he acts alone. They have limited their recognition of this type of concerted activity, however, to two situations: (1) that in which the lone employee intends to induce group activity, and (2) that in which the employee acts as a representative of at least one other employee. See, *e. g.*, *ARO, Inc.* v. *NLRB*, 596 F. 2d, at 717; *NLRB* v. *Northern Metal Co.*, 440 F. 2d 881, 884 (CA3 1971). The disagreement over the *Interboro* doctrine, therefore, merely reflects differing views regarding the nature of the relationship that must exist between the action of the individual employee and the actions of the group in order for § 7 to apply. We cannot say that the Board's view of that relationship, as applied in the *Interboro* doctrine, is unreasonable.

The invocation of a right rooted in a collective-bargaining agreement is unquestionably an integral part of the process that gave rise to the agreement. That process—beginning with the organization of a union, continuing into the negotia-

---

[8] Section 7 lists these and other activities initially and concludes the list with the phrase "*other* concerted activities," thereby indicating that the enumerated activities are deemed to be "concerted." See n. 1, *supra.*

tion of a collective-bargaining agreement, and extending through the enforcement of the agreement—is a single, collective activity.[9]   Obviously, an employee could not invoke a right grounded in a collective-bargaining agreement were it not for the prior negotiating activities of his fellow employees.   Nor would it make sense for a union to negotiate a collective-bargaining agreement if individual employees could not invoke the rights thereby created against their employer. Moreover, when an employee invokes a right grounded in the collective-bargaining agreement, he does not stand alone. Instead, he brings to bear on his employer the power and resolve of all his fellow employees.   When, for instance, James Brown refused to drive a truck he believed to be unsafe, he was in effect reminding his employer that he and his fellow employees, at the time their collective-bargaining agreement was signed, had extracted a promise from City Disposal that they would not be asked to drive unsafe trucks.   He was also reminding his employer that if it persisted in ordering him to drive an unsafe truck, he could reharness the power of that group to ensure the enforcement of that promise.   It was just as though James Brown was reassembling his fellow union members to reenact their decision not to drive unsafe trucks.   A lone employee's invocation of a right grounded in his collective-bargaining agreement is, therefore, a concerted activity in a very real sense.

Furthermore, the acts of joining and assisting a labor organization, which § 7 explicitly recognizes as concerted, are related to collective action in essentially the same way that the invocation of a collectively bargained right is related to collective action.   When an employee joins or assists a labor

---

[9] As this Court noted in a different context in *Conley* v. *Gibson*, 355 U. S. 41, 46 (1957): "Collective bargaining is a continuing process.   Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, *and the protection of employee rights already secured by contract.*" (Emphasis added.)

organization, his actions may be divorced in time, and in location as well, from the actions of fellow employees. Because of the integral relationship among the employees' actions, however, Congress viewed each employee as engaged in concerted activity. The lone employee could not join or assist a labor organization were it not for the related organizing activities of his fellow employees. Conversely, there would be limited utility in forming a labor organization if other employees could not join or assist the organization once it is formed. Thus, the formation of a labor organization is integrally related to the activity of joining or assisting such an organization in the same sense that the negotiation of a collective-bargaining agreement is integrally related to the invocation of a right provided for in the agreement. In each case, neither the individual activity nor the group activity would be complete without the other.[10]

The *Interboro* doctrine is also entirely consistent with the purposes of the Act, which explicitly include the encourage-

---

[10] Of course, at some point an individual employee's actions may become so remotely related to the activities of fellow employees that it cannot reasonably be said that the employee is engaged in concerted activity. For instance, the Board has held that if an employer were to discharge an employee for purely personal "griping," the employee could not claim the protection of § 7. See, *e. g.*, *Capital Ornamental Concrete Specialties, Inc.*, 248 N. L. R. B. 851 (1980).

In addition, although the Board relies entirely on its interpretation of § 7 as support for the *Interboro* doctrine, it bears noting that under § 8(a)(1) an employer commits an unfair labor practice if he or she "interfere[s] with, [or] restrain[s]" concerted activity. It is possible, therefore, for an employer to commit an unfair labor practice by discharging an employee who is not himself involved in concerted activity, but whose actions are related to other employees' concerted activities in such a manner as to render his discharge an interference or restraint on those activities. In the context of the *Interboro* doctrine, for instance, even if an individual's invocation of rights provided for in a collective-bargaining agreement, for some reason, were not concerted activity, the discharge of that individual would still be an unfair labor practice if the result were to restrain or interfere with the concerted activity of negotiating or enforcing a collective-bargaining agreement.

ment of collective bargaining and other "practices funda-
mental to the friendly adjustment of industrial disputes aris-
ing out of differences as to wages, hours, or other working
conditions." 29 U. S. C. § 151. Although, as we have said,
there is nothing in the legislative history of § 7 that specifi-
cally expresses the understanding of Congress in enacting
the "concerted activities" language, the general history of
§ 7 reveals no inconsistency between the *Interboro* doctrine
and congressional intent. That history begins in the early
days of the labor movement, when employers invoked the
common-law doctrines of criminal conspiracy and restraint
of trade to thwart workers' attempts to unionize. See *Auto-
mobile Workers* v. *Wisconsin Employment Relations Board
(Briggs & Stratton)*, 336 U. S. 245, 257–258 (1949). As this
Court recognized in *NLRB* v. *Jones & Laughlin Steel Corp.*,
301 U. S. 1, 33 (1937), a single employee at that time "was
helpless in dealing with an employer; . . . he was dependent
ordinarily on his daily wage for the maintenance of himself
and family; . . . if the employer refused to pay him the wages
that he thought fair, he was nevertheless unable to leave the
employ and resist arbitrary and unfair treatment; . . . union
was essential to give laborers opportunity to deal on an
equality with their employer."

Congress' first attempt to equalize the bargaining power of
management and labor, and its first use of the term "concert"
in this context, came in 1914 with the enactment of §§ 6 and
20 of the Clayton Act, which exempted from the antitrust
laws certain types of peaceful union activities. 15 U. S. C.
§ 17; 29 U. S. C. § 52.[11] There followed, in 1932, the Norris-
La Guardia Act, which declared that "the individual . . .
worker . . . shall be free from the interference, restraint, or
coercion, of employers . . . in self-organization or in *other*

---

[11] In § 20 of the Clayton Act, Congress provided that "no . . . injunction
shall prohibit any person or persons, whether singly or *in concert,* from
. . . ceasing to perform any work [or other specified activities]." 29
U. S. C. § 52 (emphasis added).

*concerted activities for the purpose of collective bargaining or other mutual aid or protection.*"  29 U. S. C. § 102 (emphasis added).  This was the source of the language enacted in § 7.  It was adopted first in § 7(a) of the National Industrial Recovery Act and then, in 1935, in § 7 of the NLRA.  See generally Gorman & Finkin, The Individual and the Requirement of "Concert" Under the National Labor Relations Act, 130 U. Pa. L. Rev. 286, 331–346 (1981).

Against this background, it is evident that, in enacting § 7 of the NLRA, Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment.  There is no indication that Congress intended to limit this protection to situations in which an employee's activity and that of his fellow employees combine with one another in any particular way.  Nor, more specifically, does it appear that Congress intended to have this general protection withdrawn in situations in which a single employee, acting alone, participates in an integral aspect of a collective process.  Instead, what emerges from the general background of § 7— and what is consistent with the Act's statement of purpose— is a congressional intent to create an equality in bargaining power between the employee and the employer throughout the entire process of labor organizing, collective bargaining, and enforcement of collective-bargaining agreements.

The Board's *Interboro* doctrine, based on a recognition that the potential inequality in the relationship between the employee and the employer continues beyond the point at which a collective-bargaining agreement is signed, mitigates that inequality throughout the duration of the employment relationship, and is, therefore, fully consistent with congressional intent.  Moreover, by applying § 7 to the actions of individual employees invoking their rights under a collective-bargaining agreement, the *Interboro* doctrine preserves the integrity of the entire collective-bargaining process; for by invoking a

right grounded in a collective-bargaining agreement, the employee makes that right a reality, and breathes life, not only into the promises contained in the collective-bargaining agreement, but also into the entire process envisioned by Congress as the means by which to achieve industrial peace.

To be sure, the principal tool by which an employee invokes the rights granted him in a collective-bargaining agreement is the processing of a grievance according to whatever procedures his collective-bargaining agreement establishes. No one doubts that the processing of a grievance in such a manner is concerted activity within the meaning of § 7. See, *e. g.*, *NLRB* v. *Ford Motor Co.*, 683 F. 2d 156, 159 (CA6 1982); *Crown Central Petroleum Corp.* v. *NLRB*, 430 F. 2d 724, 729 (CA5 1970). Indeed, it would make little sense for § 7 to cover an employee's conduct while negotiating a collective-bargaining agreement, including a grievance mechanism by which to protect the rights created by the agreement, but not to cover an employee's attempt to utilize that mechanism to enforce the agreement.

In practice, however, there is unlikely to be a bright-line distinction between an incipient grievance, a complaint to an employer, and perhaps even an employee's initial refusal to perform a certain job that he believes he has no duty to perform. It is reasonable to expect that an employee's first response to a situation that he believes violates his collective-bargaining agreement will be a protest to his employer. Whether he files a grievance will depend in part on his employer's reaction and in part upon the nature of the right at issue. In addition, certain rights might not be susceptible of enforcement by the filing of a grievance. In such a case, the collective-bargaining agreement might provide for an alternative method of enforcement, as did the agreement involved in this case, see *supra*, at 825, or the agreement might be silent on the matter. Thus, for a variety of reasons, an employee's initial statement to an employer to the effect that he believes a collectively bargained right is being violated, or the em-

ployee's initial refusal to do that which he believes he is not obligated to do, might serve as both a natural prelude to, and an efficient substitute for, the filing of a formal grievance. As long as the employee's statement or action is based on a reasonable and honest belief that he is being, or has been, asked to perform a task that he is not required to perform under his collective-bargaining agreement, and the statement or action is reasonably directed toward the enforcement of a collectively bargained right, there is no justification for overturning the Board's judgment that the employee is engaged in concerted activity, just as he would have been had he filed a formal grievance.

The fact that an activity is concerted, however, does not necessarily mean that an employee can engage in the activity with impunity. An employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7. See, *e. g., Crown Central Petroleum Corp.* v. *NLRB, supra,* at 729; *Yellow Freight System, Inc.,* 247 N. L. R. B. 177, 181 (1980). Cf. *Eastex, Inc.* v. *NLRB,* 437 U. S. 556 (1978); *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956). Furthermore, if an employer does not wish to tolerate certain methods by which employees invoke their collectively bargained rights, he is free to negotiate a provision in his collective-bargaining agreement that limits the availability of such methods. No-strike provisions, for instance, are a common mechanism by which employers and employees agree that the latter will not invoke their rights by refusing to work. In general, if an employee violates such a provision, his activity is unprotected even though it may be concerted. *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270 (1956). Whether Brown's action in this case was unprotected, however, is not before us.

### B

Respondent argues that the *Interboro* doctrine undermines the arbitration process by providing employees with the possibility of provoking a discharge and then filing an unfair

labor practice claim. Brief for Respondent 34–42. This argument, however, misses the mark for several reasons. First, an employee who purposefully follows this route would run the risk that the Board would find his actions concerted but nonetheless unprotected, as discussed above.

Second, the *Interboro* doctrine does not shift dispute resolution from the grievance and arbitration process to NLRB adjudication in any way that is different from the alternative position adopted by the Court of Appeals, and pressed upon us by respondent. As stated above, see *supra*, at 828, the Court of Appeals would allow a finding of concerted activity if two employees together invoke a collectively bargained right, if a lone employee represents another employee in addition to himself when he invokes the right, or if the lone employee invokes the right in a manner that is intended to induce at least one other employee to join him. In each of these situations, however, the underlying substance of the dispute between the employees and the employer is the same as when a single employee invokes a collectively bargained right by himself. In each case the employees are claiming that their employer violated their collective-bargaining agreement, and if the complaining employee or employees in those situations are discharged, their unfair labor practice action would be identical to an action brought by an employee who has been discharged for invoking a collectively bargained right by himself. Because the employees in each of these situations are equally well positioned to go through the grievance and arbitration process, there is no basis for singling out the *Interboro* doctrine as undermining that process any more than would the approach of respondent and the Courts of Appeals that have rejected the doctrine.

Finally, and most importantly, to the extent that the factual issues raised in an unfair labor practice action have been, or can be, addressed through the grievance process, the Board may defer to that process. See *Collyer Insulated Wire*, 192 N. L. R. B. 837 (1971); *Spielberg Manufacturing*

*Co.*, 112 N. L. R. B. 1080 (1955). There is no reason, therefore, for the Board's interpretation of "concerted activit[y]" in § 7 to be constrained by a concern for maintaining the integrity of the grievance and arbitration process.

### III

In this case, the Board found that James Brown's refusal to drive truck No. 244 was based on an honest and reasonable belief that the brakes on the truck were faulty. Brown explained to each of his supervisors his reason for refusing to drive the truck. Although he did not refer to his collective-bargaining agreement in either of these confrontations, the agreement provided not only that "[t]he Employer shall not require employees to take out on the streets or highways any vehicle that is not in safe operating condition," but also that "[i]t shall not be a violation of this Agreement where employees refuse to operate such equipment, unless such refusal is unjustified." See *supra*, at 825. There is no doubt, therefore, nor could there have been any doubt during Brown's confrontations with his supervisors, that by refusing to drive truck No. 244, Brown was invoking the right granted him in his collective-bargaining agreement to be free of the obligation to drive unsafe trucks. Moreover, there can be no question but that Brown's refusal to drive the truck was reasonably well directed toward the enforcement of that right. Indeed, it would appear that there were no other means available by which Brown could have enforced the right. If he had gone ahead and driven truck No. 244, the issue may have been moot.

Respondent argues that Brown's action was not concerted because he did not explicitly refer to the collective-bargaining agreement as a basis for his refusal to drive the truck. Brief for Respondent 21–22. The Board, however, has never held that an employee must make such an explicit reference for his actions to be covered by the *Interboro* doctrine, and we find that position reasonable. We have often recognized the im-

portance of "the Board's special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963). As long as the nature of the employee's complaint is reasonably clear to the person to whom it is communicated, and the complaint does, in fact, refer to a reasonably perceived violation of the collective-bargaining agreement, the complaining employee is engaged in the process of enforcing that agreement. In the context of a workplace dispute, where the participants are likely to be unsophisticated in collective-bargaining matters, a requirement that the employee explicitly refer to the collective-bargaining agreement is likely to serve as nothing more than a trap for the unwary.

Respondent further argues that the Board erred in finding Brown's action concerted based only on Brown's reasonable and honest belief that truck No. 244 was unsafe. Brief for Respondent 38. Respondent bases its argument on the language of the collective-bargaining agreement, which provides that an employee may refuse to drive an unsafe truck "unless such refusal is unjustified." In the view of respondent, this language allows a driver to refuse to drive a truck only if the truck is objectively unsafe. Regardless of whether respondent's interpretation of the agreement is correct, a question as to which we express no view, this argument confuses the threshold question whether Brown's conduct was concerted with the ultimate question whether that conduct was protected. The rationale of the *Interboro* doctrine compels the conclusion that an honest and reasonable invocation of a collectively bargained right constitutes concerted activity, regardless of whether the employee turns out to have been correct in his belief that his right was violated. See Part II, *supra*. No one would suggest, for instance, that the filing of a grievance is concerted only if the grievance turns out to be meritorious. As long as the grievance is based on an honest and reasonable belief that a right had been violated, its filing is a concerted activity because it is an integral part of the process by which the collective-bargaining agreement is en-

forced. The same is true of other methods by which an employee enforces the agreement. On the other hand, if the collective-bargaining agreement imposes a limitation on the means by which a right may be invoked, the concerted activity would be unprotected if it went beyond that limitation. See *supra*, at 837.

In this case, because Brown reasonably and honestly invoked his right to avoid driving unsafe trucks, his action was concerted. It may be that the collective-bargaining agreement prohibits an employee from refusing to drive a truck that he reasonably believes to be unsafe, but that is, in fact, perfectly safe. If so, Brown's action was concerted but unprotected. As stated above, however, the only issue before this Court and the only issue passed upon by the Board or the Court of Appeals is whether Brown's action was concerted, not whether it was protected.

## IV

The NLRB's *Interboro* doctrine recognizes as concerted activity an individual employee's reasonable and honest invocation of a right provided for in his collective-bargaining agreement. We conclude that the doctrine constitutes a reasonable interpretation of the Act. Accordingly, we accept the Board's conclusion that James Brown was engaged in concerted activity when he refused to drive truck No. 244. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion, including an inquiry into whether respondent may continue to defend this action on the theory that Brown's refusal to drive truck No. 244 was unprotected, even if concerted.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

Under the *Interboro* doctrine, an individual employee is deemed to have engaged in "concerted activit[y]," within the

meaning of § 7 of the National Labor Relations Act (Act), 29 U. S. C. § 157, if the right he reasonably and in good faith asserts is grounded in his employer's collective-bargaining agreement.[1]   On this view, the reasonable, good-faith assertion of a right contained in the collective-bargaining agreement is said to be an extension of the concerted action that produced the agreement; alternatively, the reasonable, good-faith assertion of the contract right is said to affect the rights of all the other employees in the work force. See *ante*, at 829.   Thus, if the employer "interfere[s] with, restrain[s], or coerce[s]" the employee in response to the latter's assertion of the alleged contract right, the *Interboro* doctrine enables the employee to file a § 8(a)(1) unfair labor practice charge with the National Labor Relations Board (Board).   See 29 U. S. C. § 158(a)(1). Although the concepts of individual action for personal gain and "concerted activity" are intuitively incompatible,[2] the Court today defers to the Board's judgment that the *Interboro* doctrine is necessary to safeguard the exercise of rights previously won in the collective-bargaining process. Since I consider the *Interboro* doctrine to be an exercise in undelegated legislative power by the Board, I respectfully dissent.

In my view, the fact that the right the employee asserts ultimately can be grounded in the collective-bargaining agreement is not enough to make the individual's self-interested action concerted.   If it could, then *every* contract claim

---

[1] See *Interboro Contractors, Inc.*, 157 N. L. R. B. 1295, 1298 (1966), enf'd, 388 F. 2d 495 (CA2 1967); see also *Bunney Bros. Construction Co.*, 139 N. L. R. B. 1516, 1519 (1962).

[2] The Court and the Board agree that the Act cannot be read to cover, or to give the Board jurisdiction over, purely personal, though work-related, claims of individual employees.   See *ante*, at 833, n. 10; Brief for Petitioner 16, and n. 9.   They also agree that the mere fact that an asserted right can be presumed to be of interest to other employees is not a sufficient basis for labeling it "concerted."   See *ante*, at 829, n. 6; *Meyers Industries, Inc.*, 268 N. L. R. B. 493 (1984).

could be the basis for an unfair labor practice complaint. But the law is clear that an employer's alleged violation of a collective agreement cannot, by itself, provide the basis for an unfair labor practice complaint. See *NLRB* v. *C & C Plywood Corp.*, 385 U. S. 421, 427–428 (1967); *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502, 509–513 (1962). Congress once considered a proposal that would have given the Board "general jurisdiction over all alleged violations of collective bargaining agreements." *NLRB* v. *C & C Plywood Corp.*, 385 U. S., at 427. But it realized that "[t]o have conferred upon the National Labor Relations Board generalized power to determine the rights of parties under all collective agreements would have been a step toward governmental regulation of the terms of those agreements." *Ibid.* Thus, Congress expressly decided that, "[o]nce [the] parties have made a collective bargaining contract[,] the enforcement of that contract should be left to the usual processes of the law and not to the . . . Board." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 42 (1947). By basing the determination whether activity is "concerted" on the assertion's ultimate grounding in the collective-bargaining agreement,[3] the *Interboro* doctrine's extension of the concerted activity proviso transfers the final authority for interpreting all contracts and for resolving all contract disputes back to the Board. This arrogation of power violates Congress' decision to the contrary.

Of course, the Board has considerable discretion to act on contractual matters which are incident to unfair labor practice proceedings. See *NRLB* v. *C & C Plywood, supra.* But the fact that the Board can resolve contractual matters incident to unfair labor practice disputes does not give it au-

---

[3] The *Interboro* doctrine is especially disturbing in this respect, since it does not require the individual expressly to refer to the contract provision supporting the claim or even to be aware of the existence of the agreement. See *ante*, at 839–841; accord, 256 N. L. R. B. 451, 454 (1981). One would think that a rule defining "concerted activity" would require the employee to have some idea that he is engaging in it.

thority to make unfair labor practice claims out of the contractual disputes themselves. The statutory authority to interpret *some* contract provisions is not authority to resolve *all* labor contract disputes.[4] Congress' decision not to give the Board this broad power indicates that it considered the difference between individual and concerted activity to be a meaningful one. Indeed, when viewed in light of the scheme Congress created for enforcing labor contract rights, the *Interboro* doctrine turns out to be nothing less than a Trojan horse dressed up in legal form.

This Court has previously recognized that the labor laws were designed to encourage employees to act together. See, *e. g.*, *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 260–264 (1975). Even a single employee acting in good faith and asserting a right contained in the collective-bargaining agreement may be too fearful, inarticulate, or lacking in skill to relate accurately either the event being investigated or the relevant extenuating factors. Other disinterested employees, especially knowledgeable union stewards, can assist the employee and the employer in eliciting the relevant facts and in preventing misunderstandings and hard feelings. The participation of other employees may save production time, reduce administrative expenses, and avoid unnecessary discharges and disciplinary action. By providing an increased

---

[4] The Court rather glibly suggests that, to the extent factual issues raised in an unfair labor practice proceeding have been, or can be, addressed through the grievance process, the Board will defer to that process. See *ante*, at 838–839. Yet the Court does not discuss why the Board did not defer to that process in this case, where the union determined that there was no objective basis to the grievance. *Ante*, at 827. Moreover, as I have discussed at some length elsewhere, the Board hardly applies its deferral criteria evenhandedly or consistently. See *Schaefer* v. *NLRB*, 464 U. S. 945 (1983) (O'CONNOR, J., dissenting). Finally, the question whether deferral will occur or is appropriate is relevant only if the Board has jurisdiction in the first place, and that is precisely the issue the Court must decide today.

degree of statutory coverage to employees participating in that process, the labor laws encourage and preserve the "practice and procedure of collective bargaining." *Emporium Capwell Co.* v. *Western Addition Community Organization*, 420 U. S. 50, 62 (1975). The fact that two employees receive coverage where one acting alone does not is therefore entirely consistent with the labor laws' emphasis on collective action. See *NRLB* v. *Allis-Chalmers Mfg. Co*, 388 U. S. 175, 180 (1967); *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650, 653 (1965).

The Court and the Board insist that, because the group has previously expressed interest in the right now being asserted, the individual's self-interested expression must be treated as "concerted" to ensure that meaning is given to the contract rights. This argument is mistaken. It confuses the employees' substantive contract entitlements with the process by which those entitlements are to be vindicated. When employees act together in expressing a mutual concern, contractual or otherwise, their action is "concerted" and the statute authorizes them to seek vindication through the Board's administrative processes.[5] In contrast, when an employee acts alone in expressing a personal concern, contractual or otherwise, his action is not "concerted"; in such cases, the statute instructs him to seek vindication through his union, and where necessary, through the courts. See *Republic Steel Corp.* v. *Maddox, supra; Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554 (1976). Under either scenario, the integrity of the rights won in the collective-bargaining process and the rights of all other employees are preserved. The question is whether these rights will be

---

[5] The Board may, of course, require the employees to first seek satisfaction from contractual arbitration and grievance procedures. See *William E. Arnold Co.* v. *Carpenters*, 417 U. S. 12 (1974). But that deferral decision can properly be made only *after* an unfair labor practice is properly filed, which requires a determination whether "concerted activity" is involved in the first instance.

vindicated by administrative or by private and judicial processes.  It is clear that Congress believes "day-to-day adjustments in the contract and other working rules, resolutions of new problems not covered by existing agreements, and the *protection of employee rights already secured by contract,*" *Conley* v. *Gibson,* 355 U. S. 41, 46 (1957) (emphasis added), are more suitably handled, not by the Board, but by the employees' collective representative and, if necessary, the courts.  See *supra,* at 842–843.  The *Interboro* doctrine is therefore against Congress' judgment as to how contract rights are best vindicated.

Finally, the *Interboro* doctrine makes little sense when applied to the facts of this case.  There is no evidence that employee James Brown discussed the truck's alleged safety problem with other employees, sought their support in remedying the problem, or requested their or his union's assistance in protesting to his employer.  He did not seek to warn others of the problem or even initially to file a grievance through his union.  He simply asserted that the truck was not safe enough for *him* to drive.  James Brown was not engaging in "concerted activity" in any reasonable sense of the term, and therefore his employer could not have violated § 8(a)(1) of the Act when it discharged him.  The fact that the right asserted can be found in the collective-bargaining agreement may be relevant to whether activity of that type should be "protected," but not to whether it is "concerted." The *Interboro* doctrine is, in my view, unreasonable in concluding otherwise.

I do not mean to imply by this dissent that conduct should not be considered "concerted" because it is engaged in by only a single employee.  The crucial issue is, as the Court notes, the precise nature of the relationship that must exist between the action of an individual employee and the actions of the group.  See *ante,* at 830–831.  An employee certainly engages in "concerted activity" when he acts with or expressly on behalf of one or more of the other employees.  And, as

several of the Courts of Appeals have concluded, the statutory language can even be stretched to cover an individual who takes action with the proven object of inducing, initiating, or preparing for group action. See, *e. g., ARO, Inc.* v. *NLRB,* 596 F. 2d 713, 717 (CA6 1979); *NLRB* v. *Northern Metal Co.,* 440 F. 2d 881, 884 (CA3 1971); see also *Kohls* v. *NLRB,* 203 U. S. App. D. C. 139, 142–143, 629 F. 2d 173, 176–177 (1980). But it stretches the language past its snapping point to cover an employee's action that is taken solely for personal benefit.

Accordingly, I respectfully dissent.