**WHEELING–PITTSBURGH STEEL CORPORATION, Petitioner, Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross Petitioner.**

Nos. 86–5107, 86–5157.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1986.

Decided June 18, 1987.

Jonathan M. Norman (argued), Vorys, Sater, Seymour and Pease, Cincinnati, Ohio, for petitioner, cross respondent.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Karen Cordry (argued), John Elligers, Bernard Levine, Regional Director, Region 8, NLRB, Cleveland, Ohio, for respondent, cross petitioner.

Paul Alan Levy (argued), Public Citizen Litigation Group, Washington, D.C., amicus curiae & intervenor.

Before KRUPANSKY, NELSON and RYAN, Circuit Judges.

RYAN, Circuit Judge.

Wheeling-Pittsburgh seeks review of the NLRB's order reinstating an employee who was discharged for refusing to operate unsafe equipment. The NLRB declined to defer to an arbitration decision upholding the discharge and, on the merits, determined that the discharge violated §§ 8(a)(3) & (1) of the National Labor Relations Act. The NLRB did not abuse its discretion in declining to defer, and because the decision is supported by substantial evidence, the order for reinstatement will be enforced.

## I.

Ernest Swiger was employed with Wheeling-Pittsburgh, a major steel corporation, from April 1971, until February 1981, when he received a five-day suspension followed by discharge for refusing to perform his job. On the date of his suspension, Swiger was assigned the task of operating the ore bridge crane. The crane is an elevated structure that moves north and south on four legs while an operator sits on a trolley that moves east and west across the bridge. A 14-ton bucket is attached to the bridge with cables to pick up ore and other materials.

At around 11:30 a.m., while Swiger was operating the crane, he noticed four fellow employees standing near the bottom of the crane motioning him to come down. They informed Swiger that the crane appeared to be swaying east and west in an unusual twisting fashion with the back legs lifting off their mounts by ¼ to 1½ inches. Upon inspection, Swiger and the others found that several bolts were missing and others were so rusty that they could be snapped off by hand, and that the cables supporting the bucket were badly frayed.

Harry Ferguson, the shift foreman, noticed that the crane was not operating and approached the five men to inquire why. The employees described the problems and Swiger told Ferguson that he felt the crane was not safe to operate. Ferguson went back to the office and called the maintenance foreman, Carl Jendretzky.

Swiger and Brian Maguire, one of the employees who warned Swiger and himself a former bridge crane operator, decided to call a Union Safety representative as prescribed in the Collective Bargaining Agreement. On their way back to the office to make the call, the two men met Ferguson who told them that Jendretzky was on his way. Swiger and Ferguson returned to the bridge crane and Maguire stayed at the office to call a Union Safety representative. At the site, Jendretzky examined the crane,

determined that it was safe to operate, and ordered Swiger back to work. When Swiger insisted that he thought the crane was unsafe and refused to operate it until it was repaired, he was suspended and, a short time later, was told to leave the premises.

The safety provisions of the Collective Bargaining Agreement provide:

"An employee who believes he is being required to work under conditions which are unsafe beyond the normal hazard inherent in the job, may notify his Supervisor who shall make an immediate investigation. If the employee is not satisfied with the result of the investigation, he shall be permitted to call to the job a Union Safety representative. If the Supervisor and the Plant Union Safety Committee representative cannot satisfactorily resolve the complaint of the employee, the co-chairman of the plant Joint Safety Committee shall be immediately advised and an immediate meeting shall be held to consider and resolve the employee complaint. The co-chairman of the plant Joint Safety Committee will agree to eliminate the condition, if such condition exists, or in the event of a disagreement, shall advise the President of the Local Union and the Plant Manager, or their designated representative, who may, by mutual agreement, stop the operation."

These procedures were only partially followed. While Jendretzky examined the crane, Maguire contacted Union Safety representative Charlie Stock. However, Swiger had already been suspended for refusing to operate the crane. Stock advised Swiger to remain at the plant, but at 2:45 p.m., Swiger was ordered off the premises.

The second shift operator, Robert Coulter, also refused to operate the crane. Stock had contacted another safety representative, Cliff Spinner, and by the time the two arrived at the plant, millwrights had begun replacing the missing and rusted bolts. Coulter had called Ernie Tripodi, the General Foreman. Tripodi and the two safety representatives decided that Coulter should not operate the crane until the re-

pairs were completed. At about 9:00 p.m. Coulter agreed to operate the crane for the remainder of his shift. Coulter was not disciplined for his conduct.

Swiger challenged his termination through the grievance process and proceeded to final arbitration in which the discharge was upheld. Swiger then filed an unfair labor practice charge with the NLRB. The ALJ refused to defer to the arbitration decision and decided the matter anew, on the merits, in Swiger's favor. The NLRB remanded for reconsideration in light of its decision in *Olin Corporation,* 268 NLRB Dec. (CCH) ¶ 16,028 (1984). The ALJ adhered to his original decision stating, in addition, that the arbitrator had not been presented with the facts relevant to determining the unfair labor practice. The NLRB affirmed.

## II.

■ The NLRB has broad discretion in deciding whether to defer to a previous arbitration decision. *John Klann Moving & Trucking Co. v. NLRB,* 411 F.2d 261 (6th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969). "In its seminal decision in *Spielberg [Manufacturing Co.,* 112 N.L.R.B. 1080 (1955)] the Board held that it would defer to an arbitration award where the proceedings appear to have been fair and regular, all parties have agreed to be bound, and the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act." *Olin,* 268 NLRB Dec. (CCH) at 27,-320. Interpreting *Spielberg,* the NLRB conditioned deferral on the arbitrator's actual consideration of the unfair labor practice charge. *Raytheon Co.,* 140 N.L.R.B. 883, 886 (1963). *Accord NLRB v. Magnetics International Inc.,* 699 F.2d 806 (6th Cir.1983). The *Olin* decision limits these elusive standards by holding that the arbitrator has adequately considered the unfair labor practice if "(1) the contractual issue is factually parallel to the unfair labor practice issue, and (2) the arbitrator was presented generally with the facts relevant to resolving the unfair labor practice." *Id.*

Although the issues pertaining to the unfair labor practice claim in this case were factually parallel to the issues determined by the arbitrator in deciding that Swiger was discharged for just cause under the contract, the ALJ found that the facts necessary to resolve these issues were not presented at arbitration. The factual issues to be resolved in both forums were: (1) whether Swiger believed in good faith that the crane was unsafe, and (2) whether Swiger had the right to cease work until the contractual procedures were followed. The testimony taken at the arbitration hearing was not transcribed and the arbitrator has since died. However, it appears that only Swiger, Maguire, Stock, Jendretzky, Ferguson and Tripodi testified at the hearing. The other employees who warned Swiger that the crane was unstable, and Coulter, who refused to operate the crane on the second shift, did not testify.

### A.

On the question whether Swiger believed in good faith that the crane was not safe to operate, the arbitrator heard Swiger's superiors testify that they felt the crane was safe and that Coulter "agreed to and did operate the crane on the second shift." Coulter did not testify, however, and it is undisputed that Coulter did not operate the crane until after repairs were made. Additionally, the arbitrator's opinion specifies that none of the "phantom employees," as he described them, who warned Swiger appeared to testify. The arbitrator appears to have erred in that observation because Maguire did testify at the arbitration hearing. The arbitrator's opinion also refers to the millwrights' having replaced the missing bolts; but the arbitrator appears to have been unaware that these repairs were completed several hours after Swiger's suspension. It appears to have been this limited and inaccurate view of the facts that led the arbitrator to find that Swiger did not have a good faith belief that the crane was unsafe.

### B.

Turning to the second issue, the arbitrator found that Swiger made no attempt to contact a Union Safety representative. Nevertheless, the opinion recites that "the Company left nothing undone in pursuing Swiger's complaint." Apparently, having heard safety representative Stock testify that the crane was fixed and safe, coupled with the fact that a Union Safety representative was called, the arbitrator concluded that these efforts were undertaken *before* Swiger was suspended. Although this was not the case, the arbitrator determined that Swiger had no contractual right to cease work and was therefore discharged for just cause.

The ALJ, on the other hand, heard Coulter testify that he also refused to operate the crane for safety reasons. Maguire testified that he saw the crane's back legs "jumping off" their mounts and that he and Swiger decided to call a safety representative. The ALJ concluded that the arbitrator had mischaracterized Maguire's testimony and found that Ferguson was aware of Swiger's attempt to enforce the safety provisions of the Collective Bargaining Agreement. Moreover, the ALJ heard testimony from all of the "phantoms" and reasonably concluded that they were not "phantoms" at all. Hence, the ALJ found that the arbitrator was not presented with the facts relevant to resolving the unfair labor practice.

Wheeling-Pittsburgh contends that the ALJ abused its discretion in refusing to defer. Specifically, Wheeling-Pittsburgh argues that deferral cannot be avoided merely because the employee could have presented a better case. In *Electrical Workers IBEW Local 1522*, 180 N.L.R.B. 131 (1969), the NLRB stated:

> "[T]o disregard the award merely because certain evidence was presented and contentions advanced in the unfair labor practice proceeding which were not presented in arbitration, would do violence to the Board's policy of encouraging the finality of settlements reached

through voluntary agreement upon dispute settlement machinery."

*Id.* at 132.

In affirming the ALJ's decision, the NLRB determined that the ALJ complied with the *Olin* standards for deferral and did not abuse its discretion. Concurring with the NLRB finding, Member Dennis explains that the evidence considered by the ALJ in this case was not simply different, it was critical. We agree. Implicit in the NLRB's decision is the determination that the arbitrator could not have decided the unfair labor practice fairly without additional, critical evidence. As a result, the arbitrator could not have been presented with the facts relevant to resolving the unfair labor practice. Under these circumstances, the ALJ did not abuse its discretion in declining to defer.

### III.

 On the merits, the ALJ determined that Swiger's discharge violated §§ 8(a)(3) & (1) of the National Labor Relations Act. Where the Collective Bargaining Agreement provides that an employee is not required to use unsafe equipment, the refusal to operate such equipment is concerted, protected activity. *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). The evidence in this case clearly supports the ALJ's decision. *See generally, Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Accordingly, the Board's order will be enforced.