**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1424

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

ANNALEE GRIFFIN, d/b/a North Carolina License
Plate Agency #18,

Respondent.

On Application for Enforcement of an Order of the National Labor
Relations Board.  (11-CA-20479)

Argued:  March 12, 2007                Decided:  June 20, 2007

Before WILKINSON, MICHAEL, and KING, Circuit Judges.

Enforcement granted by unpublished per curiam opinion.

**ARGUED:** Philip Marshall Van Hoy, VAN HOY, REUTLINGER, ADAMS & DUNN,
Charlotte, North Carolina, for Respondent.  William M. Bernstein,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.
**ON BRIEF:** G. Bryan Adams, III, VAN HOY, REUTLINGER, ADAMS & DUNN,
Charlotte, North Carolina, for Respondent.  Ronald Meisburg,
General Counsel, John E. Higgins, Jr., Deputy General Counsel, John
H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy
Associate General Counsel, Meredith L. Jason, Supervisory Attorney,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The National Labor Relations Board seeks to enforce an order for reinstatement, damages, and other relief for three employees terminated from a license plate agency in Goldsboro, North Carolina. The Board found that the terminations violated § 8 of the National Labor Relations Act ("NLRA" or "the Act"), as an unfair labor practice in abridgement of the employees' right to engage in protected concerted activities under § 7 of the Act. The employer argues that the employees were not engaged in protected activity and that they were dismissed for disloyalty and poor performance. We find these contentions to be without merit and grant the application for enforcement.

I.

North Carolina License Plate Agency #18 ("the Company") is a private contractor for the state of North Carolina. The Company provides motor vehicle registration and license plate services to the public and is compensated by the North Carolina Department of Motor Vehicles ("DMV") on a per-transaction commission basis.

Annalee Griffin is sole proprietor of the Company. At the beginning of 2004, the Company had five full-time employees: assistant manager Kerry Haddock; title specialists Robin Haybarker, Karen Michelle Haybarker, and Laura Schilling; and renewal clerk

2

Julie Wells. The Haybarkers are husband and wife. Schilling and Wells are Griffin's daughters.

In early 2004, Haddock and the Haybarkers experienced problems at work. They alleged that their workload increased owing to the work habits of their co-workers Wells and Schilling. They alleged that Wells and Schilling would frequently call in late, leave early, and miss work altogether; that Wells would fall asleep at her desk; and that Schilling would bring her children to the office at least once a week, where they would play in the employees' cash drawers, draw pictures on their work stations, and be disruptive.

On April 13, 2004, Haddock and the Haybarkers had a formal thirty-minute meeting with Griffin about these issues. They expressed their concerns that the situation increased their own workload and was indicative of a "separate set of rules" in the office for Griffin's children. In response, Griffin stated that Wells was on medication and promised to speak to her. Before and after the April 13 meeting, the Haybarkers also brought complaints to DMV Field Auditor and Supervisor Cindy Jobe, whose territory includes the Company. In June 2004, Griffin terminated Wells.

On August 12, 2004, Griffin asked to meet with Haddock and the Haybarkers after work. She began the meeting by stating that, although the Haybarkers had arranged to take off the following day, Friday, August 13, they could not both do so. Later in the conversation, Robin Haybarker renewed the employees' work-related

complaints.  He stated that Schilling's conduct continued to be an issue and that office morale remained low.  Haybarker additionally stated that the employees were upset that they had received only a small raise and no bonus.  Finally, Haybarker said that he had raised these concerns with Field Auditor/Supervisor Jobe and that he was considering filing a complaint with the DMV.  Michelle Haybarker nodded in agreement, and Haddock indicated that she too had considered filing a complaint with the state.

After listening to the employees' complaints, Griffin went to her office and returned almost immediately with paychecks for the three employees.  When Robin Haybarker asked why his check was only for four days, Griffin told the Haybarkers that it was their last day and asked for their keys.  After the Haybarkers left the office, Griffin told Haddock that she had not performed satisfactorily as assistant manager and discharged her as well.

On August 20, 2004, Griffin wrote a letter to the North Carolina Employment Security Commission ("ESC") challenging applications for unemployment compensation filed by Haddock and the Haybarkers.  Regarding Griffin's reasons for discharging the three employees, the letter stated,

> [T]hese three were very critical of my leadership, my management style, their salaries, and generally dissatisfied with how the office was functioning. During this [August 12] conversation it became obvious that they did not have my best interest or the best interest of the office at heart.  Based on this conversation and their

4

accusations it was obvious to me that I had no other option but to terminate their employment.

The letter also stated that Haddock had "exacerbated the problem by joining in with the other two employees." Id. During a later ESC hearing, Griffin testified that it was during the August 12 conversation that she made a final decision to terminate Haddock and the Haybarkers.

Acting on a charge filed by Robin Haybarker on September 13, 2004, the NLRB General Counsel issued a complaint alleging that the Company violated § 8(a)(1) of the NLRA by discharging the three employees for engaging in activity protected by the Act. Following a hearing, Administrative Law Judge John H. West found that the employees' discharge had violated § 8(a)(1). On January 25, 2006, the NLRB issued a Decision and Order affirming the ALJ's rulings, findings, and conclusions, and adopting his recommended Order. The Board found (1) that the employees engaged in protected concerted activity; (2) that Griffin's animus toward this activity was a reason for the dismissals; (3) and that the Griffin did not establish that the employees would have otherwise been discharged. The Board ordered the Company to offer Haddock and the Haybarkers reinstatement, make them whole for any loss of earnings and benefits, and remove from its files any reference to their discharges. The case is before this court on the application of the NLRB to enforce the order.

5

Section 7 of the NLRA protects the right of employees to self-organize; to form, join, or assist labor organizations; to bargain collectively; and to "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (2000). Section 8(a)(1) makes it unlawful for employers "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." Id. § 158(a)(1).[1]

In considering whether an employee's discharge violates the Act, there must be a showing "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the protected activity was a substantial or motivating factor for the employer's action." RGC (USA) Mineral Sands, Inc. v. NLRB, 281 F.3d 442, 448 (4th Cir. 2002); see Wright Line, 251 N.L.R.B. 1083 (1980). Once a prima facie case of a violation is established, the burden then shifts to the employer to

---

[1]We required supplemental briefing on the matter of the NLRB's jurisdiction and appreciate the parties' submissions. The Supreme Court has held that the NLRA vests the Board with "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." See NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226 (1963). We conclude that, in the context of a business dealing with motor vehicle licensing and registration procedures, the requisite connection to interstate commerce exists. See United States v. Cobb, 144 F.3d 319, 322 (4th Cir. 1998) (recognizing power of Congress to regulate motor vehicles as instrumentalities of interstate commerce).

show that it would have taken the same action absent the protected activity. See RGC, 281 F.3d at 448. If the reasons the employer advances for its actions are nonexistent or pretextual, the employer's burden is not met, and its defense fails. See NLRB v. Air Contact Transp., Inc., 403 F.3d 206, 215 (4th Cir. 2005). On review, this court must uphold the Board's findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (2000).

## A.

The Company first argues that the employees' discharge did not violate the Act because they were not engaged in protected concerted activity as defined by § 7. Rather, Robin Haybarker was speaking solely for his personal benefit when he raised workplace concerns.

"Concerted" activities include "the activities of employees who have joined together in order to achieve common goals." NLRB v. City Disposal Sys. Inc., 465 U.S. 822, 830 (1984). Section 7's safeguard of concerted activities undertaken for "mutual aid and protection" extends "even to activities that do not involve unions or collective bargaining." Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 746 (4th Cir. 1998); see NLRB v. Wash. Aluminum Co., 370 U.S. 9, 14 (1962). The Supreme Court has recognized that § 7 does not protect all concerted activities: it does not protect, for instance, unlawful or violent acts, acts in breach of contract, or

7

acts of disloyalty against the employer.  <u>Wash. Aluminum Co.</u>, 370 U.S. at 17.  But apart from such exceptions, § 7 has a wide compass, providing general protection to workers' efforts to "improve their lot as employees."  <u>Eastex, Inc. v. NLRB</u>, 437 U.S. 556, 565 (1978).

We affirm the Board's conclusion that the employees were engaged in protected concerted activity in this case.  The three approached Griffin as a group on April 13 to bring workplace problems to her attention.  The problems persisted, however, culminating in the August 12 meeting.  The complaints raised at the August 12 meeting -- complaints about "favoritism, wages, and bonuses" -- involve the type of workplace issues that § 7 enables employees to address.  <u>See, e.g.</u>, <u>Eastex</u>, 437 U.S. at 565.  As the Board found, the employees were also engaging in protected activity when they considered taking these same complaints to the DMV.  <u>See id.</u> (protected activity includes efforts to improve workplace conditions "through channels outside the immediate employee-employer relationship").

Moreover, contrary to the Company's contentions, there is no indication that Robin Haybarker acted alone in furtherance of personal goals.  Rather, substantial evidence supports the Board's conclusion that the employees worked together and that Robin Haybarker undertook to speak for the other employees, who were present with him at the meeting and who expressed agreement with

8

his representations and his proposal to contact the DMV.  Indeed,

Griffin's August 20 letter to the North Carolina ESC states that,

at the August 12 meeting, "these three were very critical" about

working conditions and that Haddock "exacerbated the problem by

joining in with the other two employees."[2]

Thus, Haddock and the Haybarkers were involved in protected

concerted activity.

B.

The Company next contends that, even if the employees were

engaged in protected concerted activity, their discharge did not

violate § 8(a)(1), because the discharges were not motivated by the

protected activity.  We find, however, that substantial evidence

supports the Board's conclusion that employees' protected activity

was a "substantial or motivating reason" for their terminations.

See Medeco, 142 F.3d at 742.  Griffin's own letter to the North

Carolina ESC demonstrates as much.  Explaining why Griffin

discharged the three employees, the letter states:

> [T]hese three were very critical of my leadership, my
> management style, their salaries, and generally
> dissatisfied with how the office was functioning. During
> this [August 12] conversation it became obvious that they
> did not have my best interest or the best interest of the

---

[2]The Company contends that the ALJ and the Board erred in admitting Griffin's letter and testimony from the North Carolina ESC proceeding because they were privileged under state law.  We do not think the Board erred, however, in declining to allow a state evidentiary privilege to trump the need for relevant and probative evidence in this federal proceeding.

office at heart. Based on this conversation and their accusations it was obvious to me that I had no other option but to terminate their employment.

This letter makes clear that, contrary to the Company's current contentions, the decision to terminate Haddock and the Haybarkers was made during the August 12 meeting and in significant part in response to the employees' protected activity. In addition, on October 7, Griffin testified at an ESC hearing that it was during the August 12 conversation that she made a final decision to discharge the three employees. The Board also properly found that the timing of the dismissals, immediately following the employees' threat to file a complaint, provided strong independent evidence that their protected activity motivated their dismissals. Thus we uphold the Board's conclusion that the employees' protected activity was a substantial or motivating factor in their dismissals.

C.

The Company finally contends, as an affirmative defense, that even if the employees were dismissed in part for their protected activity, no violation of the Act occurred because Griffin would have dismissed them in any case for reasons of poor performance and disloyalty. In particular, the Company claims that the employees were planning to open a competing license plate agency. The Company bore the burden of proving this affirmative defense. See RGC, 281 F.3d at 448.

10

The Company had a full opportunity to present this alternative account of the firings before the ALJ. The Company's account was based almost entirely upon Griffin's uncorroborated testimony. The ALJ, however, found that "Annabelle Griffin was not a credible witness" and discredited her testimony except where corroborated by reliable evidence. Because the ALJ is best positioned to evaluate the credibility of the witnesses, this court will overturn Board findings based on an ALJ's credibility determinations only when "exceptional circumstances" compel reversal. NLRB v. CWI of Maryland, Inc., 127 F.3d 319, 326 (4th Cir. 1997).

The Company points to no such exceptional circumstances in this case. As the ALJ found and the Board affirmed, the claim that Griffin was planning on firing Haddock and the Haybarkers prior to the August 12 meeting is belied by a number of facts. For one, the employees had received no verbal or written warnings about their alleged poor job performance. Also, while Griffin claims that she resolved to fire the employees after the Haybarkers missed work on April 30, by August 12 more than three months had passed with no action on Griffin's part. Further, the fact that Griffin began the August 12 meeting by telling the Haybarkers that they had to come to work the next day undermines her claim that she called the meeting for the purpose of firing them.

As to the allegation that the three employees were planning to open a competing license plate agency, the ALJ found that there was

11

no evidence that this was the case or that it caused the dismissals. Field Auditor/Supervisor Jobe in her affidavit stated that Robin Haybarker had never said that he was seeking to open such an office but had merely asked her what it would take to open one. Jobe further stated that she had told Haybarker that an application to open another agency would not be approved. In any case, as the ALJ found and the Board affirmed, during the August 12 meeting Griffin confronted the employees about Haybarker's question to Jobe without bringing up possible termination in that context. It was only later, when the employees said that they were considering bringing a complaint with the DMV, that Griffin terminated them. Thus the Board properly discredited the assertion that the employees' alleged disloyalty would have led to their dismissal.

## III.

For the foregoing reasons, we grant the Board's application for enforcement of its order.

ENFORCEMENT GRANTED

12