**EL GRAN COMBO de PUERTO RICO, d/b/a El Gran Combo, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 87–1756.

United States Court of Appeals, First Circuit.

Heard March 8, 1988.

Decided Aug. 3, 1988.

Carlos Bobonis Gonzalez with whom Bobonis, Bobonis & Rodriguez Poventud, Santurce, P.R., was on brief for petitioner.

Howard E. Perlstein, Supervisory Atty., with whom Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., were on brief for respondent.

Before COFFIN, BREYER and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

This case requires us to decide whether the National Labor Relations Board ("the Board") was justified in deciding that two musicians were dismissed from employment with their band for engaging in protected concerted activities under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157. The Board's finding overruled a decision to the contrary earlier issued by an Administrative Law Judge ("ALJ"). The employer, El Gran Combo de Puerto Rico, d/b/a El Gran Combo ("the Combo") petitions for review of the Board's order of July 20, 1987. That decree ordered the Combo to reinstate the two employees to their former or substantially equivalent positions and pay damages for loss of earnings and benefits. The Board cross-petitions for enforcement of its order. Though this is a very close case, we find it necessary to defer to the discretion and expertise of the Board, and agree to enforce the order.

I.

El Gran Combo is a band that performs music and dance at nightclubs and discos throughout Puerto Rico, Central and South America, and the continental United States. It was founded in 1962 by Raphael Ithier, who is currently its director, arranger, pianist, and business manager. Ithier hires and fires the band members, and has substantial if not complete control over all financial concerns of the Combo, including band members' remuneration. He also is the musical leader of the band, making most decisions regarding repertoire, performances, etc.

Jose Luis Duchesne was hired as a saxophone player in 1969. Mike Ramos was hired the next year as a dancer. Ramos also sang in the chorus and played the guiro, a percussion instrument made from a gourd. Duchesne and Ramos were discharged by Ithier at the end of 1979, effective during January 1980. These dismissals gave rise to this action.

Beginning in 1972, the Combo made numerous recordings on its own record label. The first eleven records were not financial successes; the income gained therefrom was used merely to defray travel and other expenses and to purchase band outfits. The individual band members were not paid the record proceeds directly and were not reimbursed for rehearsal and recording time attendant to the making of the records. The Combo recorded its twelfth record, "Aqui No Se Sienta Nadie," in May and June 1979. Ithier, thinking that this record had the potential to make some money, sought an agent for distribution. Eventually one Ralph Cartagena, owner of Rico Records Distributors of New York City, offered the Combo a deal. In exchange for allowing Rico to distribute the record, the band members were each individually to receive $1000 up front.

Ithier brought Cartagena's offer to the attention of the group during a rehearsal in the Fall of 1979. Ramos was not present at this meeting. Everyone in the band noted their assent to the arrangement except Duchesne, who told Ithier and the Combo that he thought the record to be worth substantially more money. He was not satisfied with the proposed proceeds. Ithier became upset at this, and responded, "Duchesne, you have a very short time left working with me." Ithier accused Duchesne of being very greedy.

Shortly thereafter, the members of the Combo met in New York to discuss the offer again. Ramos once more was not present. The contract was executed shortly thereafter. Ithier, acting as director and leader of the group, gave Cartagena exclusive rights to the record in exchange for $16,000, to be distributed to the Combo at $1000 per member and $5000 for Ithier.

The contract also provided for additional compensation in the event of sales over 35,000 copies. The album was released by Cartagena in October 1979. On a trip to New York later that fall, Cartagena paid each of the Combo members $1000. Sometime later, he mailed additional checks in the amount of $650, representing each member's share of additional income for sales over 35,000 copies.

In late November, Duchesne once again expressed, at a meeting of the band, his displeasure with the completed arrangement, but seemed resigned to accept it given his minority status. At that meeting, Ithier explained that Ramos was not to receive a $1000 share, because he had not performed on the album. Duchesne subsequently visited Ramos and informed him that he (Ramos) was being cut out of the proceeds. Duchesne suggested that Ramos speak to Ithier about this matter, which both Duchesne and Ramos considered unfair. Ramos, believing that direct confrontation of Ithier would be counterproductive, instead approached another band member, Tati Maldonado, who often handled various administrative matters for Ithier, including payments to band members. Ramos told Maldonado that he was unhappy about being excluded from the record's proceeds. Maldonado responded that he could not help, and suggested that Ramos go directly to Ithier.

Ramos then reiterated his unhappiness to various other members of the Combo, some of whom testified at the hearing. Although the Combo members denied that Ramos was seeking their assistance, Ramos himself testified that he was requesting help, and both the ALJ and the Board credited his testimony.

Ithier testified that he had heard about Duchesne's visit to Ramos, and had also been informed that Ramos and Duchesne had been saying things about Ithier behind his back. In particular, he was told that Duchesne and Ramos had accused Ithier of "stealing" from the Combo. Combo member Aponte testified that Duchesne had told him he did not trust Ithier, and that Ithier was "stealing" from the band. The

Board found, and we concur, that this reference to "stealing" was used by Duchesne and Ramos in the figurative or colloquial sense, and that it was understood by the Combo members and by Ithier to refer to the alleged underpayment on the record proceeds.

On December 27th, while the Combo was on vacation, Ithier wrote Duchesne and Ramos identical letters of discharge, giving them each two weeks notice. A complaint filed with the musicians' union local was largely unsuccessful; it resulted merely in the extension of the termination date by a few days. The discharged employees then filed this action with the Board.

## II.

Following an extensive but confusing hearing, the ALJ dismissed the complaint in its entirety. As to Ramos, the ALJ found that he was attempting to enlist support of his fellow band members, but only for an interest (Ramos' share of the proceeds) that was individual in nature, and possibly adverse to the interests of those he was soliciting. According to the ALJ, this was not activity for "mutual aid or protection," and therefore not protected activity under section 7 of the Act, 29 U.S.C. § 157. The ALJ also found that the "precipitating cause" of Ramos's discharge was Ithier's conclusion that Ramos's "stealing" comments produced intolerable dissension within the organization.

As for Duchesne, the ALJ determined that the subject of his complaints was not encompassed by the protections of section 7. Due to the amorphous nature of the Combo's method of bargaining and the fact that Ithier consulted with the Combo before accepting the deal, the ALJ concluded that the earnings from the album were not wages derived from the members' status as employees, but rather "more in the nature of partnership shares in a joint venture." The ALJ concluded that "Duchesne's basic complaint did not involve statutorily protected subject matter but related to the propriety and profitability of a business undertaking by the association...."

In the alternative, the ALJ found that even if Duchesne was complaining about "wages," his complaint was his own personal gripe not shared by any other Combo member. Therefore, the ALJ reasoned, Duchesne's grievances, at least after he was outvoted 11–1, did not constitute "concerted activity" under section 7. The ALJ did not discuss whether Duchesne's actions constituted solicitation of assistance from the other Combo members. Finally, the ALJ found that Duchesne's "stealing" comments were the direct cause of Duchesne's discharge by Ithier.

The Board reversed the decision of the ALJ, over a dissent by Chairperson Dotson. 284 N.L.R.B. No. 112 (July 20, 1987). As an initial matter, the Board found that the money in dispute was properly characterized as wages or benefits, rather than as partnership shares in a joint venture. This finding was primarily premised on the fact that Ithier retained total control over the Combo's financial affairs, reserved for himself the decision on how the proceeds were to be divided, and pursuant to this discretion reserved $5000 for his own efforts and excluded Ramos altogether.

The Board then found that both Ramos and Duchesne were involved in protected section 7 activity by virtue of their soliciting other band members for assistance in demanding more proceeds from the sale of the album. The fact that Ramos's alleged solicitation was only for his own benefit was not, according to the Board, material for purposes of section 7 analysis. Once Duchesne's and Ramos's acts were so characterized, the Board spent little effort concluding that these protected activities were the cause of the discharges. The Board found most significant the fact that "Ithier admitted that it was the dissension resulting from these acts which caused him to discharge both Duchesne and Ramos."

## III.

Before turning to the central question of whether Duchesne and Ramos were discharged because of protected concerted activity, we address several preliminary, threshold issues raised by petitioner.

These issues all arise because of the unusual nature of the legal relationship between Ithier and the other band members, and the atypical sense in which the proceeds at issue here could be considered wages or benefits of employment.

First, the Combo argues that the Board did not have jurisdiction over the defendant, because "El Gran Combo" is not a legal person or entity. Petitioner claims that under Puerto Rico law, the Combo is not a legal association with legal status separate from that of its individual members. Therefore, it is argued, there can be no Board or court action against a non-entity.[1]

■ However, petitioner admitted to the ALJ that it was in fact an unincorporated association, and the ALJ so found. As such an association, the Combo may be classified as an employer within the meaning of 29 U.S.C. §§ 152(1) & (2), and therefore is subject to the Act. The Combo's admission was not reneged before the Board. Therefore, petitioner is estopped under 29 U.S.C. § 160 from arguing the point before us in the first instance. Indeed, we are without jurisdiction to consider arguments that have not been presented to the Board for initial consideration. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982).

■ Petitioner next argues that, even if the Combo is an association for purposes of this appeal, the associates could only have consisted of the band members themselves. If this were the case, it is argued, those band members could not at the same time have been "employees" under the Act. But this logical twist, whatever its merit, also was waived below. The Combo admitted in its answer that it was the employer of Duchesne and Ramos, and this characterization was never challenged during Board proceedings. In addition, the Combo conceded that Ithier was the supervisor of

the aggrieved members. This issue, too, is thus foreclosed from our review.

The Combo's next contention is that the money about which Duchesne and Ramos were complaining was not in the form of wages or benefits, but was instead the proceeds from a joint venture entered into by all of the Combo members. Such proceeds would not, petitioner argues, constitute a condition of employment or a labor practice of the employer. Therefore, the argument runs, action in regard to such concerns would not be protected activity under section 7. *See NLRB v. Local Union 1229, Int'l Brotherhood of Electrical Workers*, 346 U.S. 464, 476, 74 S.Ct. 172, 178–79, 98 L.Ed. 195 (1953). For this contention, petitioner relies on the ALJ's finding that "despite the fact that [Ithier] was clothed with apparent and perhaps actual authority to act on behalf of the association, [he] declined to accept Cartagena's offer without first consulting the band members."

The Board found, however, that Ithier's discussion of the contract with the rest of the band did not transform the Combo or its financial dealings into a joint venture. In particular, the Board noted that Ithier retained control over how the proceeds were to be divided, which was one of the principal issues about which Ramos and Duchesne complained. The Board ruled that the disputed funds were wages, and that therefore the complainants' activity could be protected under section 7.

■ Even were we to disagree with the Board's characterization of the funds at issue, we are required to give the Board great deference in determining the scope of protected activity under section 7. "[T]he task of defining the scope of § 7 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it,' *Eastex, Inc. v. NLRB*, 437 U.S. 556, 568, 98 S.Ct. 2505, 2513–14, 57 L.Ed.2d 428 (1978), and on an issue that implicates its expertise in labor relations, a

---

1. Although "El Gran Combo de Puerto Rico, d/b/a El Gran Combo" is the captioned party on this appeal, counsel insists that they were hired by the "combo members individually,"

and that they are representing "El Gran Combo" as a "nominal party" only "for procedural reasons." Petitioner's Brief at 8 n. 4.

reasonable construction by the Board is entitled to considerable deference." *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) (citations omitted). Regardless of whether we call the proceeds wages or joint venture profits, then, the Board was within its discretion in deciding that disputes as to those proceeds can be protected under section 7. Implicit in the Board's ruling was the conclusion that it was not material whether Ithier sought the approval of the Combo members. In other words, just because an employer involves employees in a decision-making process does not mean that those employees lose their protection to engage in collective activities to dispute the decision that is finally made.

We turn, then, to the central issue on appeal—whether Duchesne and Ramos were discharged in response to activities protected under section 7 of the Act.

### IV.

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise the rights guaranteed in section 157 of this title [section 7 of the Act]." It is undisputed that discharge constitutes the restraint or coercion declared unfair under section 8.

Section 7, 29 U.S.C. § 157, provides in turn that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." In enacting section 7, "Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment." *NLRB v. City Disposal Services, Inc.*, 465 U.S. 822, 835, 104 S.Ct. 1505, 1513, 79 L.Ed.2d 839 (1984).

This case concerns the last clause of section 7, in particular, the right to engage in "concerted activities" for "mutual aid and protection." It is helpful to enumerate, in part, the different types of activities that are protected by section 7, and to explain how they are each concerted in nature and for the benefit of mutual aid or protection. These two prongs of the standard, concerted action and mutual benefit, have not been construed in an overly literal fashion.

■ The most obvious and noncontroversial type of activity protected by section 7 is where two or more employees are working together at the same time and place toward a common goal. *See City Disposal Systems*, 465 U.S. at 831, 104 S.Ct. at 1511. It is well established, however, that section 7 does not confine itself to such a narrow meaning of concerted activity for mutual aid and protection. *Id.* For instance, there are various sorts of activities that can be engaged in by *single* employees that nevertheless fall under the rubric of "concerted action." As the Supreme Court has noted, Section 7 "itself defines both joining and assisting labor organizations—activities in which a single employee can engage—as concerted activities." *Id. See also id.* at 831 n. 8, 104 S.Ct. at 1511 n. 8. Section 7 also protects an employee who is acting as a representative of at least one other employee. *Id.* at 831, 104 S.Ct. at 1511. Even where an action may look at first to be solely individual in nature, subsequent events may reveal implicit group endorsement. *See NLRB v. Mount Desert Island Hosp.*, 695 F.2d 634, 640 (1st Cir.1982). Congress additionally intended to provide protection "in situations in which a single employee, acting alone, participates in an integral aspect of a collective process." *City Disposal Systems*, 465 U.S. at 835, 104 S.Ct. at 1513. Thus, a lone employee's invocation of a right grounded in a collective bargaining agreement is concerted activity under the Act. *See generally City Disposal Systems.*

Just as many seemingly individual actions may be "concerted" for purposes of the Act, some activities that seem to concern only individual rights or benefits can properly be considered "for mutual aid or

protection." For instance, in the above-described case where an individual employee attempts to reap the benefits of a collective bargaining agreement, it matters not that the employee's specific actions may only have been taken with a view for her own regard. The individual, by asserting her own rights, strengthens the mechanisms of protection that benefit the entire group. *See City Disposal Systems*, 465 U.S. at 831–36, 104 S.Ct. at 1511–14. Restraining the rights of one employee will quite likely chill the exercise of those rights for all.[2]

Similarly, an employee is protected in seeking the assistance of his union representative at a confrontation or meeting with his employer. "This is true even though the employee alone may have an immediate stake in the outcome; he seeks 'aid or protection' against a perceived threat to his employment security." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 260, 95 S.Ct. 959, 965, 43 L.Ed.2d 171 (1975). The representative, however, safeguards "not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of imposing punishment unjustly." *Id.* at 260–61, 95 S.Ct. at 965 (footnote omitted). The Supreme Court has cited with approval Judge Learned Hand's realistic appraisal of such a situation:

> When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a "concerted activity" for "mutual aid or protection," although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is "mutual aid" in the most literal sense, as nobody doubts.

*NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505–06 (2d Cir. 1942) (cited with approval in *J. Weingarten*, 420 U.S. at 251, 95 S.Ct. at 959, and *Houston Insulation Contractors Ass'n v. NLRB*, 386 U.S. 664, 668–69, 87 S.Ct. 1278, 1280–81, 18 L.Ed.2d 389 (1967)). As the quotation indicates, union representation is not a necessary element for protection in such cases; it is necessary merely that some employees obtain or seek the assistance of others. Neither the employee seeking help nor the one providing it may be discharged for such activities.[3]

Most important for our purposes here, section 7 protects the attempts of an employee to initiate or induce or prepare for group action. This rule, originating in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683 (3d Cir.1964), has recently been "fully embraced" by the Board. *Meyers Industries, Inc. (Meyers II)*, 281 NLRB No. 118 at 15–16, 123 LRRM 1137, 1142 (1986), *aff'd sub nom. Prill v. NLRB*, 835 F.2d 1481 (D.C.Cir.1987). *See also City*

**2.** Therefore, even if the individual employee's activities cannot themselves be construed as concerted for section 7 purposes, dismissal of that employee could still trigger section 8 liability because of the chilling effect it might have on other employees' section 7 activities. "It is possible ... for an employer to commit an unfair labor practice by discharging an employee who is not himself involved in concerted activity, but whose actions are related to other employees' concerted activities in such a manner as to render his discharge an interference or restraint on those activities." *City Disposal Services*, 465 U.S. at 833 n. 10, 104 S.Ct. at 1512 n. 10.

**3.** There is currently a dispute between the Board and one court of appeals about whether the Act requires an employer to allow a non-union representative to accompany another employee at a disciplinary interview. *See Sears, Roebuck & Co.*, 274 N.L.R.B. 230 (1985), *enforcement denied pending remand sub nom. Slaughter v. NLRB*, 794 F.2d 120 (3d Cir.1986). *See also J. Weingarten*, 420 U.S. at 270 n. 1, 95 S.Ct. at 969 n. 1 (Stewart and Powell, JJ., dissenting) (right recognized by majority must be extended to non-union representation as well); *ITT Lighting Fixtures v. NLRB*, 719 F.2d 851, 854–56 (6th Cir.1983) (same); *NLRB v. Columbia University*, 541 F.2d 922, 931 & n. 5 (2d Cir.1976) (same). However, there should be no dispute that the employee's *request* for representation is itself protected, whether or not the employer must respect that request. That is, an employee cannot be fired for merely seeking assistance. *See Sears*, 274 N.L.R.B. at 231 n. 8 (opinion of Member Dennis).

*Disposal Systems,* 465 U.S. at 831, 104 S.Ct. at 1511; *Randolph Division, Ethan Allen, Inc. v. NLRB,* 513 F.2d 706, 708 (1st Cir.1975). Because it is particularly germane to this case, we set out the *Mushroom Transportation* reasoning at length:

> It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.
>
> This is not to say that preliminary discussions are disqualified as concerted activities merely because they have not resulted in organized action or in positive steps toward presenting demands. We recognize the validity of the argument that, inasmuch as almost any concerted activity for mutual aid and protection has to start with some kind of communication between individuals, it would come very near to nullifying the rights of organization and collective bargaining guaranteed by section 7 of the Act if such communications are denied protection because of lack of fruition. However, that argument loses much of its force when it appears from the conversations themselves that no group action of any kind is intended, contemplated, or even referred to.
>
> Activity which consists of mere talk must, in order to be protected, be talk looking toward group action.

330 F.2d at 685. *See also Prill,* 755 F.2d at 954–55 n. 79 (citing numerous Board cases protecting preparatory and initiative activities); *Randolph Division, Ethan Allen, Inc.,* 513 F.2d 706 (employee's inquiries to employer regarding financial concerns of company protected because they are "preparation" for union activity); *Hugh H. Wilson Corp. v. NLRB,* 414 F.2d 1345, 1347 (3d Cir.1969) ("To protect concerted activities in full bloom, protection must necessarily be extended to 'intended, contemplated or even referred to' group action, ... lest employer retaliation destroy the bud of employee initiative aimed at bettering terms of employment and working conditions.") (quoting *Mushroom* ).

■ In contrast to solicitation, preparation, and inducement, "mere griping" is not afforded protection. *Mushroom,* 330 F.2d at 685; *see also City Disposal Systems,* 465 U.S. at 883 n. 10, 104 S.Ct. at 1512 n. 10; *NLRB v. Datapoint Corp.,* 642 F.2d 123, 128–29 (5th Cir. Unit A 1981); *Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23 (7th Cir.1980) (series of "diffuse" individual complaints to the employer might form partial basis for legitimate dismissal); *Indiana Gear Works v. NLRB,* 371 F.2d 273, 277 (7th Cir.1967) (posting of ridiculing cartoons merely part of pattern of habitual sarcastic reflections). Unfortunately, previous cases have not provided a clear dividing line between solicitation and "mere griping," except that the latter "looks forward to no action at all." *Mushroom,* 330 F.2d at 685.

■ Our principal task in the instant case is to determine whether the Board was justified in characterizing Duchesne's and Ramos's actions as solicitations of assistance. Our standard is highly deferential. "So long as the Board's position represents a 'choice between two fairly conflicting views,' it should be enforced even if this court 'would justifiably have made a different choice had the matter been before it *de novo.*' " *NLRB v. Amber Delivery Service, Inc.,* 651 F.2d 57, 61 (1st Cir.1981) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)).

## V.

On the subject of the nature of Duchesne's and Ramos's actions, the record can best be described as murky. There is no doubt that they were both upset about the terms of the record contract, and they let their displeasure be known to various members of the band. Duchesne even offered a public protest to Ithier at a band meeting. There seems to be no dispute that both complainants accused Ithier of "stealing" from the band. The Board rea-

sonably found that this was a reference to the alleged unfairness of the division of record proceeds.

The Board characterized Ramos's and Duchesne's actions as "repeated attempts to enlist the support of the other combo members." The evidence, though unclear, supports this finding. Ramos himself testified, in response to a direct question from the ALJ, that he did solicit help from "many" members of the band. He claims, for instance, to have asked Tati Maldonado to intervene on his behalf, only to find that Maldonado was afraid to speak to Ithier for fear of reprisal. Maldonado himself denied that Ramos had ever asked for help. Two other band members, Gabriel Serrano, and Carlos Aponte, also testified that Ramos had never solicited assistance. The Board, however, was free to accept Ramos's testimony while rejecting that of other witnesses. It was entitled to credit Ramos's testimony that all of the band members were intimidated by Ithier, in fear that they would be disciplined if they broke ranks, and that this was the cause of their acquiescence in everything Ithier suggested. Indeed, this would explain why no one would corroborate Ramos's characterization of his discussions with them. Significantly, the ALJ, who ruled against Ramos on other grounds, himself found that Ramos had made an effort "to enlist the support of other band members." Evidently, then, the ALJ credited Ramos's testimony, and questioned that of his former colleagues on this issue. We cannot find that the Board erred in accepting this finding, which was a matter of witness credibility.[4]

Duchesne's case is even clearer. There is little doubt that his objection at the Combo meeting was meant to light a fire under the rest of the band members. Aponte even testified that Duchesne's comment

about the inadequacy of the $1000 "was made in a way of asking support." It can fairly be assumed that his continued complaints were, like Ramos's, meant to implore or persuade others to take a stance against Ithier.

Undoubtedly, there was an element of "griping" as well in at least some of Duchesne's and Ramos's comments. At some point, they must have realized that their efforts would be unsuccessful, that Ithier had the loyalty, whether through fear, respect, or simple solidarity, of the other Combo members. Duchesne even declined to object to the record contract at a later meeting, knowing the futility of his isolated protest. This example exposes the futility of the sharp distinction between griping and entreaty. In most circumstances like these, an employee's complaints will function as both. But section 7 should be applicable unless the activity is "*mere* talk," or "*mere* griping." *Mushroom*, 330 F.2d at 685 (emphasis supplied). "[I]f an employer were to discharge an employee for *purely* personal 'griping,' the employee could not claim the protection of § 7." *City Disposal Systems*, 465 U.S. at 833 n. 10, 104 S.Ct. at 1512 n. 10 (emphasis supplied). Thus, even if Ramos and Duchesne were griping, they were also soliciting, and such activity can be considered concerted activity for mutual aid or protection under section 7.

## VI.

A more subtle problem is raised by petitioner. Ithier's testimony suggests that the *reason* for discharge may have been the "griping" aspect of the activity, rather than its function as requests for assistance. In particular, Ithier complained that Ramos's and Duchesne's comments were causing "dissension." He ex-

---

4. It is immaterial that Ramos was seeking assistance only for himself, and that any proceeds he garnered might have been subtracted from those received by the other Combo members. As we explain above, *supra* at 1002–03, requesting assistance for one's own benefit can fairly be characterized as "for mutual aid or protection," since the employee is requesting the exercise of "vigilance to make certain that the employer does not initiate or continue a prac-

tice of imposing punishment unjustly." *J. Weingarten*, 420 U.S. at 260–61, 95 S.Ct. at 965. As Judge Hand explained, the rest of the employees have an interest in helping the solely aggrieved individual, because next time it could be one of them that is the victim of the employer's arbitrary or unfair practices. The "solidarity … established is 'mutual aid' in the most literal sense, as nobody doubts." *Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d at 505–06.

plained his dismissal of Duchesne as follows:

> I would say that he is a very problematic person. He would always be in opposition to my orders. He was never in agreement with the money and in trying to keep the unity. I could not keep him in the group because every time we had a new member he would try to spoil his mind by telling him things.

What Ithier is really claiming is that, *despite* the section 7 character of Ramos's and Duchesne's activity, he has a defense to section 8 liability because their activity impermissibly disrupted the working environment, i.e., that he could lawfully discharge Duchesne and Ramos because their section 7 activity had unprotected collateral effects. "Not all conduct that can, in some general sense, be characterized as an exercise of a right enumerated in section 7 is afforded the protection of the Act." *Texas Instruments Inc. v. NLRB*, 637 F.2d 822, 830 (1st Cir.1981) (citations omitted). "An employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7." *City Disposal Systems*, 465 U.S. at 837, 104 S.Ct. at 1514.

Determining whether section 7 activity is nevertheless *un*protected is a difficult task; the rights "must in each instance be understood in relation to the concrete facts of a particular case." *Texas Instruments*, 637 F.2d at 830 (citations omitted). "The exact location of the dividing line between protected and excessive activity is sometimes difficult to discern...." *Keosaian v. NLRB*, 630 F.2d 36, 38 (1st Cir.1980) (per curiam). This case straddles that line, but for the reasons expressed below, we defer to the judgment of the Board on such a close case.

In a series of cases dealing with distribution of union literature, the Supreme Court has recognized an employer defense to section 8 liability where the otherwise protected activity is "inflammatory to the point of threatening disorder or other interruption of the normal functioning of the business." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 573 n. 22, 98 S.Ct. 2505, 2516 n. 22, 57 L.Ed.2d 428 (1978). *See also NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 684–85, 100 L.Ed. 975 (1956); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803–04 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945) (quoting *Matter of Peyton Packing Co., Inc.*, 49 N.L.R.B. 828, 843–44 (1943), *enforced*, 142 F.2d 1009 (5th Cir.1944)). "No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." *Babcock & Wilcox*, 351 U.S. at 113, 76 S.Ct. at 685. This principle has been applied, for example, to an employee who attempted to engage other employees in union-related discussion during working hours where the other employees repeatedly asked the initiating employee to leave the work area and stop interruption of their productivity. *NLRB v. General Indicator Corp., Redco Div.*, 707 F.2d 279, 283 (7th Cir.1983).

Keeping in mind our deferential standard of review, we conclude that the Combo has not established this defense here. The "dissension" caused by Ramos's and Duchesne's comments apparently resulted from their threat to Ithier's authority. There was no showing that their comments were made while the band was working, or that the comments disrupted the Combo's performances. Duchesne and Ramos were attempting to persuade their co-workers to be less deferential to Ithier, and to challenge the conditions of work that he imposed upon them. If this were to trigger a "disorder or interruption of the normal functioning of the business" defense, then practically all union or other organizing activity would be unprotected, because all such activity naturally will provoke some anger, hostility, and skepticism toward an employer (and possibly other employees). To deny protection in such circumstances would be virtually to eviscerate the very protections that section 7 was intended to provide. The Act is designed to encourage, not deter, collective action for mutual aid and protection. *See Eastex*, 437 U.S. at 570–76, 98 S.Ct. at 2514–17 (employees can distribute union literature in nonworking areas of company property during non-

working time); *Republic Aviation Corp.,* 324 U.S. 793, 65 S.Ct. 982 (upholding Board finding of section 8 violation for shop rules prohibiting union solicitation and wearing of union insignia).

Ithier may have been concerned that disgruntled employees would be a threat to the deferential quietude that he had engendered, but this is hardly a reason to permit the discharge of those employees who attempt to awaken their servile colleagues. "[C]oncerted activity that is otherwise proper does not lose its protected status simply because prejudicial to the employer." *NLRB v. Circle Bindery, Inc.,* 536 F.2d 447, 452 (1st Cir.1976) (citation omitted).

This case is very similar to *NLRB v. American Spring Bed Manufacturing Co.,* 670 F.2d 1236 (1st Cir.1982). In that case, an employee was fired for fomenting discontentment concerning wages. His employer demanded that he stop discussing pay because it "upset the other employees," and informed him that he "must learn to keep his mouth shut about his pay if he wanted to continue working at the Company." *Id.* at 1240. We affirmed the Board's finding that the threat of discharge constituted a section 8 violation. *American Spring Bed* differs slightly from the instant case in that the employee there was successful in garnering support from his co-workers, but this difference is immaterial. Preliminary discussions are not disqualified as concerted activity "merely because they have not resulted in organized action or in positive steps toward presenting demands." *Mushroom,* 330 F.2d at 685.

■ The Board was fully justified in concluding that Ithier dismissed Duchesne and Ramos because of their protected activity, and that it was precisely the protected nature of the activity (i.e., its tendency to encourage other employees to fight for better wages) that prompted Ithier to take action.[5] The direct evidence of Ithier's

comments to Duchesne and his testimony before the ALJ support and indeed compel such a conclusion.

*Enforcement granted.*

---

**5.** Even if Ramos's and Duchesne's activities were not protected by section 7, the Board could reasonably have concluded that Ithier's discharge of them could still have constituted a section 8 violation because it may have had the effect of deterring other employees from exercising their section 7 rights. *See supra* note 2.