USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1397

 NATIONAL LABOR RELATIONS BOARD,

 Petitioner,

 v.

 PORTLAND AIRPORT LIMOUSINE CO., INC.,
 d/b/a PALCO,

 Respondent.

 ON PETITION FOR ENFORCEMENT OF AND ORDER OF 
 THE NATIONAL LABOR RELATIONS BOARD
 
 

 Before
 
 Selya, Circuit Judge,
 
 Aldrich and Campbell, Senior Circuit Judges.
 
 

 Lawrence C. Winger, with whom Kraft & Winger were on brief for
respondent.

 Leslie Randolph, Attorney, with whom Frederick L. Feinstein,
General Counsel, Linda Sher, Associate General Counsel, John D.
Burgoyne, Acting Deputy Associate General Counsel, and Charles
Donnelly, Supervising Attorney, were on brief for petitioner. 

December 21, 1998

 
 

 CAMPBELL, Senior Circuit Judge. Before us is an
application filed by the National Labor Relations Board ("the
Board") for enforcement of its order issued against Portland
Airport Limousine Co., Inc. ("PALCO"). The Board ruled that PALCO
violated section 8(a)(1) of the Labor Management Relations Act, 29
U.S.C. 158(a)(1), when it discharged employee Wayne Speed for
engaging in what the Board determined to be protected, concerted
activity under section 7 of the Act, 29 U.S.C. 157. Speed, a
truck driver, was fired when he refused to drive his assigned
tractor because of safety concerns. This case raises the single
issue whether Speed's refusal amounted, in context, to concerted
activity or was, instead, an individual act. In holding the
former, the Board overturned the contrary decision of its
Administrative Law Judge ("ALJ"). For the reasons that follow, we
decline to enforce the decision of the Board. 

 I. BACKGROUND 
 PALCO operates a trucking facility in Scarborough, Maine. 
Wayne Speed was employed as a truck driver for PALCO from July 1994
through February 22, 1995. Speed was regularly assigned to drive
tractor number 40.
 On February 21, 1995, Speed noticed an exhaust smell in
tractor number 40. Speed inspected the tractor, but could not
locate the source of the fumes. He filed an internal driver
vehicle inspection report, which stated simply "Exhaust Leak." 
Stephen Bennett, the operations manager at PALCO, testified before
the ALJ that on the afternoon of February 21, 1995, Speed
complained to him about headaches that he felt were the result of
exhaust fumes from tractor number 40. Later that same day, Bennett
arranged for R&R Services, which regularly performs maintenance and
repair work on PALCO's equipment, to inspect the truck. R&R did
not locate any exhaust leakage in or around the engine compartment
or cab area of the truck, and reported that the truck was safe to
operate. 
 On February 22, 1995, Speed reported to work and drove
tractor number 40 to Jay, Maine. When Speed reached Jay, he called
John Connolly, the morning dispatcher at PALCO, and reported that
he had completed the run to Jay, still smelled exhaust, and thought
that the truck was unsafe to drive outside Maine. When Speed
returned to PALCO later that morning, Connolly instructed him to
take tractor number 40 to Triple J, another vehicle maintenance
operation patronized by PALCO, for a second inspection. 
 Speed took the tractor to Triple J. Initially, the
Triple J mechanics failed to locate an exhaust leak. Upon closer
inspection, however, mechanics discovered a "pinhole" sized leak in
the exhaust on the outside of the trailer. Speed reported the
mechanic's findings to Connolly, who told him to take the tractor
back to Triple J for its annual inspection, which was due to be
completed by the end of the month. Josselin Beaulieu, Triple J's
owner, testified that the Triple J mechanics did not discover
anything during the annual inspection to indicate that tractor
number 40 was unsafe. Beaulieu testified that the "pinhole" sized
leak was located at the top of the exhaust stack, which would not
result in fumes inside the tractor. 
 On February 22, 1995, Speed was scheduled to take a load
to Boston. When Speed returned from the Triple J inspection,
Bennett directed him to switch tractors with driver Emile Pelchat,
a new employee, and to make his scheduled Boston deliveries with
Pelchat's tractor. Bennett directed Speed to notify Pelchat, who
was not familiar with the run to Boston, that he was to drive
Speed's truck in the local Portland area that day. Speed saw
Pelchat driving into the yard and told him: "I'm taking your
truck. I'm not driving mine. I smell fumes." Pelchat asked Speed
what was going to happen to him, and Speed told him he did not
know. Pelchat testified that he told Speed that if tractor number
40 was not safe for Speed, it was not safe for him or any other
driver. This was the only conversation between Speed and Pelchat
concerning the condition of tractor number 40. 
 After the conversation with Speed, Pelchat went into the
dispatch office and told Bennett that if tractor 40 was not safe
for Speed to drive, he was not going to drive it either and would
quit if ordered to do so. Bennett asked Pelchat whether he was
aware of anything specifically wrong with the truck, and Pelchat
said that he was not. Bennett suggested that Pelchat drive Speed's
tractor around the block to verify for himself that he could not
smell any fumes. Pelchat did so, remained nervous about the truck
when he returned, and, due to his nervousness, had difficulty
attaching Speed's trailer to the tractor. Bennett told Pelchat to
take the rest of the day off. 
 Bennett then spoke to Mark Bernstein, PALCO's owner,
about the situation involving Speed and tractor number 40. Bennett
told Bernstein that the truck had been inspected and found safe by
both R&R and Triple J, but that Speed continued nonetheless to
refuse to drive it. Bennett also explained to Bernstein that he
had instructed Speed to exchange trucks with Pelchat, but that
Pelchat had objected to driving an unsafe tractor. Bernstein told
Bennett that he did not believe that Pelchat should have been
involved in the issue relating to the safety of Speed's tractor,
and that Speed should have been dealt with individually. Bernstein
added that drivers should not be allowed to pick and choose their
jobs, which he felt Speed was doing, and that if an employee did
not want to take an assigned load he should be dismissed.
 Speed eventually returned to the dispatch office with
Pelchat's tractor. As he was preparing his log for the trip to
Boston, dispatcher John Bell interrupted and told Speed to quit
work for the day. Immediately thereafter, Bernstein came outside
and asked Speed several times whether he was going to take tractor
number 40 to Boston. When Speed replied that he would not drive an
unsafe truck, Bernstein told Speed that if he did not drive the
truck he was fired. When Speed continued to refuse to drive
tractor number 40, he was terminated by Bernstein.
 In February 1995, the Board issued a complaint alleging
that Speed was discharged "because of his protected concerted
activities" in violation of sections 7 and 8(a)(1) of the Act. 
After a hearing, an ALJ found that Speed's complaints concerning
the safety of tractor number 40 and his conversation with Pelchat
did not constitute "concerted activity" within the meaning of
section 7 of the Act and, thus, that his termination did not
violate Section 8(a)(1) of the Act. The ALJ dismissed the
complaint. The Board reversed. The Board found that Speed had
engaged in concerted activity and that PALCO violated the Act when
it discharged Speed because of that activity. The Board's order
requires that PALCO cease and desist from the unfair labor
practices, reinstate Speed, and make Speed whole for any loss of
earnings and benefits.

 II. DISCUSSION 
 The Board seeks enforcement of its order, which was based
upon its findings that Speed (1) had engaged in "concerted
activity," and (2) was terminated by PALCO because of his concerted
activities. The Board's finding that Speed engaged in "concerted
activity" within the meaning of section 7 the Act is conclusive if
supported by substantial evidence on the record as a whole. See 29
U.S.C. 160(e). "[T]he task of defining the scope of 7 'is for
the Board to perform in the first instance as it considers the wide
variety of cases that come before it,' Eastex, Inc. v. NLRB, 437
U.S. 556, 568 (1978), and on an issue that implicates its expertise
in labor relations, a reasonable construction by the Board is
entitled to considerable deference." NLRB v. City Disposal
Systems, Inc., 465 U.S. 822 (1984) (citations omitted). We
conclude, for the reasons that follow, that the Board's finding of
"concerted activity" is not supported by substantial evidence. 
 Section 8(a)(1) of the Act makes it an unfair labor
practice for an employer "to interfere with, restrain, or coerce
employees in the exercise of the rights guaranteed in [section 7 of
the Act]." 29 U.S.C. 158(a)(1). One of the rights guaranteed to
employees in section 7 is the right to "engage in . . . concerted
activities for the purpose of collective bargaining or other mutual
aid or protection." 29 U.S.C. 157. See El Gran Combo de Puerto
Rico v. NLRB, 853 F.2d 996, 1002-004 (1st Cir. 1988). 
 As the Supreme Court has noted, "[t]he term 'concerted
activity' is not defined in the Act . . . ." City Disposal
Systems, 465 U.S. at 830. The Court explained in City Disposal
Systems that in enacting section 7, "Congress sought generally to
equalize the bargaining power of the employee with that of his
employer by allowing employees to band together in confronting an
employer regarding the terms and conditions of their employment." 
Id. at 835. The Court stated that while "concerted activity"
plainly "embraces the activities of employees who have joined
together in order to achieve common goals," id., at 830, what is
not clear from the language of the Act is "the precise manner in
which particular actions of an individual employee must be linked
to the actions of fellow employees in order to permit it to be said
that the individual is engaged in concerted activity." Id. 
 In its Meyers decisions, the Board clarified the test it
applies to determine whether an employee's actions are linked
sufficiently to the actions of fellow employees so as to be deemed
"concerted." See Meyers Indus., Inc., 268 NLRB 493 (1984) ("Meyers
I"), rev'd sub nom. Prill v. NLRB, 755 F.2d 941 (D.C. Cir.), cert.denied, 474 U.S. 948 (1985), on remand, Meyers Indus., Inc., 281
NLRB 882 (1986) ("Meyers II"), aff'd sub nom. Prill v. NLRB, 835
F.2d 1481 (D.C. Cir. 1987), cert. denied, 487 U.S. 1205 (1988). In
Meyers I, the Board held that safety complaints concerning a
company truck made by a single employee acting on his own were not
"concerted activity" within the meaning of section 7 of the Act. 
The Board stated that an employee's action may be deemed
"concerted" for purposes of section 7 only if the action is
"engaged in with or on the authority of other employees, and not
solely by and on behalf of the employee himself." Meyers I, 268
NLRB at 497 (footnote omitted). In Meyers II, the Board explained
that its objective standard of concerted activity "encompasses
those circumstances where individual employees seek to initiate or
to induce or to prepare for group action, as well as individual
employees bringing truly group complaints to the attention of
management." Meyers II, 281 NLRB at 887. 
 In his opinion, the ALJ applied Meyers II and found that
Speed had not engaged in "concerted activity" within the meaning of
section 7 of the Act. The ALJ found that "Speed's statement to
Pelchat was an individual action whose sole purpose was to benefit
himself." Portland Airport Limousine Co, Inc. d/b/a/ PALCO, 325 
NLRB No. 38 (October 13, 1995), 1998 WL 30260, at *11. The ALJ
explained: 
 After all, if the truck were really unsafe as
 alleged by Speed, exchanging with Pelchat
 would have a detrimental effect upon him. By
 telling Pelchat that he was exchanging trucks
 with him, Speed was not seeking to initiate,
 induce or prepare for group action. Rather,
 he was simply following Bennett's direction
 and notifying Pelchat that they were to
 exchange tractors.

Id. 
 In ruling, to the contrary, that Speed was engaged in
"concerted activity," and that PALCO discharged Speed because of
that activity, the Board reasoned as follows:
 [T]he conversation between Speed and Pelchat
 led to Pelchat's initial refusal to drive the
 truck. Thus, this case involves two employees
 refusing to drive a truck because of a shared
 concern about the truck's safety. Once Speed
 and Pelchat had their conversation and Pelchat
 protested to management about the reassignment
 of the trucks, Speed no longer was acting in
 furtherance of an individual complaint. 
 Instead, the Respondent was faced with a
 concerted refusal by both of these employees
 to drive Speed's tractor. The Respondent knew
 about that concerted refusal, and the
 conclusion is inescapable that the Respondent
 discharged Speed as a result.

Id. at * 2.
 The Board's above reasoning stands in marked contrast to
the test for "concerted activity" described in its Meyersdecisions. The Board does not point to any evidence that Speed was
"seek[ing] to initiate or to induce or to prepare for group
action," Meyers II, 281 NLRB at 887, when he approached Pelchat and
told him that they were going to switch trucks. Pelchat's credited
testimony was that Speed told him: "I'm taking your truck. I'm
not driving mine. I smell fumes." Pelchat then asked Speed what
he was supposed to do, and Speed responded that he did not know. 
The single, brief conversation between Speed and Pelchat, which
occurred immediately after Bennett instructed Speed to switch
trucks with Pelchat and as Pelchat drove his truck into the yard,
does not support an inference that Speed sought to "join[] forces"
with Pelchat in a "common endeavor," Meyers II, 281 NLRB at 887 n.
10.
 Evidence is lacking that Speed had discussed his safety
concerns with Pelchat or any other employee prior to February 22,
1995, the day he refused to drive his truck and was terminated. 
Nor was there any evidence that Speed sought the support or
assistance of Pelchat or any other employee in remedying those
safety concerns. The brief conversation between Speed and Pelchat
does not demonstrate a concerted plan of action and there is no
evidence that Speed's refusal to drive tractor number 40 was
intended to enlist the support of Pelchat or any other employee. 
In sum, Speed's complaints "were made by himself and for himself
alone, and thus cannot be deemed concerted." Meyers I, 268 NLRB at
501. 
 The facts in this case are, indeed, nearly identical to
those held by the Board in Meyers I to be insufficient for 
"concerted activity." In Meyers I, the ALJ had found that at least
some of the discharged employee's complaints about the safety of
his truck were "concerted," since another driver made similar
complaints, in the presence of the discharged driver, about the
safety of the same vehicle. The Board rejected the ALJ's finding
that these complaints constituted "concerted activity." It stated:
 Indeed, the most that can be inferred from
 this scenario is that another employee was
 individually concerned, and individually
 complained, about the truck's condition. 
 Taken by itself, however, individual employee
 concern, even if openly manifested by several
 employees on an individual basis, is not
 sufficient evidence to prove concert of
 action. 

Id. at 501. By the same token, the instant record demonstrates
that Pelchat's complaint, while similar to and subsequent to
Speed's, was an individual complaint. There is no evidence that
Speed urged Pelchat to complain to management about tractor number
40. Speed did not accompany Pelchat to the management office when
Pelchat made his complaint. Nor is there any other evidence from
which the Board could infer that Pelchat's complaint was a
manifestation of group will or activity. 
 The facts differ from those reviewed by the Board in
Meyers I in only one significant respect. In Meyers I, there was
no evidence that the two employees had ever discussed their safety
concerns with one another, while here Speed addressed Pelchat
briefly in the yard to tell him that the two men were going to
switch trucks because Speed "smelled fumes" in tractor number 40. 
A conversation, even one involving one speaker and one listener,
may be deemed "concerted activity." See Meyers II, 281 NLRB at 889
(citing Mushroom Transp. Co. v. NLRB, 330 F.2d 683, 685 (3d Cir.
1964)). However, to qualify as such, "it must appear at the very
least that it was engaged in with the object of initiating or
inducing or preparing for group action or that it had some relation
to group action in the interest of the employees." Mushroom
Transp. Co., 330 F.2d at 685. As said, there is no evidence that
Speed was looking toward group action in the interest of fellow
employees when he spoke to Pelchat. Indeed, as the ALJ supportably
found, the exchange of vehicles would not have benefitted Pelchat
at all, but rather would have been to his detriment, as he would
have been forced to drive a truck that Speed himself considered
unsafe.
 The Board's finding that Speed had engaged in concerted
activity was based solely upon Pelchat's response to Speed's
statement that they were going to switch trucks because Speed
smelled fumes in tractor number 40. Upon learning of the proposed
switch, Pelchat confronted Bennett and refused to drive Speed's
truck. The Board reasoned that Pelchat's reaction to the proposed
vehicle exchange transformed Speed's individual complaint into
concerted activity. Under the test adopted by the Board in the
Meyers cases, however, the question is whether Speed sought when he
approached Pelchat "to initiate or to induce or to prepare for
group action." Meyers II, 281 NLRB at 887. As said, the clear
weight of the evidence is that Speed was motivated solely by his
own personal safety concerns, and was not acting as a
representative of other employees for their common benefit. 
 We find it disturbing that the Board made no attempt to
analyze the facts within its own Meyers framework. Neither,
moreover, did it purport to overrule Meyers nor articulate some new
standard. Rather, the Board proceeded on the theory that Speed
engaged in concerted activity because Speed and Pelchat raised a
safety concern and "[t]he subject matter of Speed's complaint and
his conversation with Pelchat clearly involved terms and conditions
of employment," 1998 WL 30260, at *3. This cuts close to
resurrecting, without, however, saying so, the Board's pre-Meyersrule in Alleluia Cushion Co., 221 NLRB 999 (1975) and progeny that
individual complaints concerning matters of safety may constitute
"concerted activity." In Alleluia and its progeny, the Board
determined that such complaints were "concerted" on the theory that
safe working conditions are presumed to be a matter of concern to
all within the work force. See id. at 1000. This concept of
"constructive concerted activity" was expressly rejected by the
Board in the Meyers cases in favor of the Board's present test,
which, as said, asks whether there is any objective evidence in the
record that the discharged employee sought to band together with at
least one other employee in pursuit of a common goal. As such
evidence is lacking in this case, we conclude that the Board's
finding of "concerted activity" is not supported. 
 This Circuit's decision in El Gran Combo, upon which the
General Counsel places primary reliance, does not support the
Board's present rationale. El Gran Combo, unlike this case, is
wholly consistent with the Meyers formulation. In El Gran Combo,
we held that the record supported the Board's determination that two
band members engaged in "concerted activity" where they solicited
assistance from fellow band members in protesting the terms of a
record contract entered by the band's manager. 853 F.2d at 1004-05. 
The record demonstrated that there were repeated attempts by the
objecting band members to enlist the support of their fellow band
members, including public protests of the terms of the contract made
in the presence of the manager and the other members of the band. 
We characterized one such protest as an effort to "light a fire
under the rest of the band members." Id. at 1005. Thus, the record
indicated that the employees had engaged in solicitation,
preparation, and inducement, as opposed to "mere griping," which is
not afforded protection under the Act. See City Disposal Systems,
465 U.S. at 883 n.10. In contrast, Speed's blunt statement to
Pelchat that they would be switching trucks because he "smelled
fumes" in his own truck and would not drive it was "mere griping,"
not an inducement or call to group action. 
 We recognize our duty to defer to the Board's expertise
in labor relations, and do not lightly overturn its determination. 
But deference is due only to conclusions that are supported by
substantial evidence and to constructions of the Act that are
"reasonable." In determining reasonableness, we look both at the
statutory language and at Board, as well as judicial, precedent. 
A leading commentator has pointed out that "[t]he dominant law
clearly is that an agency must either follow its own precedents or
explain why it departs from them." 2 K. Davis, Administrative Law
Treatise 11.5 at 206 (1994). See also Massachusetts Dep't of Ed.v. United States Dep't of Ed.,837 F.2d 536, 544-45 (1st Cir. 1988)
(once an agency "builds a body of precedent . . . it cannot
thereafter lightly disregard" that precedent, but must follow,
distinguish, or overrule it). Here the Board has neither followed
nor distinguished its Meyers precedents, nor has it specifically 
overruled them. Such a disregard of precedent leaves employers,
employees, ALJs and Board personnel to operate in the dark as
evidenced here by the Board's reversal of an ALJ whose only error
seems to have been to have followed the Board's own precedents. SeeDavila-Bardales v. INS, 27 F.3d 1, 5 (1st Cir. 1994)("[T]he law
demands a certain orderliness. If an administrative agency decides
to depart significantly from its own precedent, it must confront the
issue squarely and explain why the departure is reasonable."). We
have indicated that "more careful scrutiny" of Board orders is
warranted where the Board's interpretation of the facts, unlike that
of its ALJ, is not supported by application of the Board's own
precedents. NLRB v. Matouk Industries, Inc., 582 F.2d 125, 128 (1st
Cir. 1978). Applying those precedents, we hold that the record does
not support the Board's finding that Speed engaged in "concerted
activity." His section 7 rights were not, therefore, violated by
his discharge. 
 Our conclusion that Speed's discharge was not prohibited
under section 7 of the Labor Management Relations Act does not leave
drivers having similar safety concerns without a remedy. Congress
addressed the scenario before us in the Surface Transportation
Assistance Act, 49 U.S.C. 31105(a)(1) ("STAA"), which provides
that an employee may not be terminated based upon the employee's
"reasonable apprehension of serious injury to [himself] or the
public because of the vehicle's unsafe condition." Id. An
employee need not join forces with other employees to invoke the
protection of the STAA. 
 For the reasons stated, we decline to enforce the
decision and order issued by the Board.